**SUSAN N.; David N., Individually and as Parents and Natural Guardians to M.N. a minor, Appellants,**

v.

**WILSON SCHOOL DISTRICT.**

No. 94–2051.

United States Court of Appeals, Third Circuit.

Argued Oct. 10, 1995.

Decided Nov. 20, 1995.

Leonard Rieser (argued), Alyssa R. Fieo, Philadelphia, PA, for Appellants.

Andrew E. Faust (argued), Rosemary E. Mullaly, Sweet, Stevens, Tucker & Katz, Doylestown, PA, for Appellee.

Before: GREENBERG, LEWIS, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

This case arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–85 (1990). Appellants Susan and David N. brought the case individually, and as parents and natural guardians of their daughter, M., against the Wilson School District, charging that it had not fulfilled its statutory obligations to M. under the IDEA. The hearing officer at the local educational level found in appellants' favor, concluding that M. was both mentally gifted and afflicted with a specific learning disability, and that she thereby was entitled to special education. An appeals panel at the state education agency level reversed the hearing officer's findings. The appellants challenged this decision in a civil action in the district court, which affirmed the decision of the appeals panel on the record of the administrative proceedings without accepting the appellants' proffer of

additional evidence. The appellants appeal from the district court's order entered September 27, 1994, in accordance with its opinion.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  FACTUAL BACKGROUND

The appellants reside in the Wilson School District with M., who is now nine years old. They believe that M. suffers from attention deficit disorder with hyperactivity ("ADHD"), a learning disability manifested in attention problems, hyperactive motor behavior, poor social skills, extensive difficulty in completing tasks, low frustration tolerance, and low self-esteem. Memorandum and Order of the District Court ("Mem."), *Nagle v. Wilson Sch. Dist.,* No. 93–4658, slip op. at 2, 1994 WL 534813 (E.D.Pa. Sept. 26, 1994). M. has been treated with Ritalin, a medication intended to control the symptoms of ADHD. *See* Mem. at 3 n. 6. The appellants believe that M.'s disability may affect her progress in school and that she is entitled to special education from the State of Pennsylvania.

During the spring of 1992, when M. was in kindergarten, the appellants requested that the school district undertake a multidisciplinary evaluation of her to determine whether she was in need of special education.[1]  *Id.* In accordance with the appellants' request, a district multidisciplinary team ("MDT") conducted an evaluation in April 1992 that included two psychological examinations, an interview with M.'s kindergarten teacher, and discussions with appellants. *Id.* at 2–3. The MDT issued a report on June 2, 1992, concluding that M. was not "exceptional,"[2] and

---

1. Under the IDEA, "special education" is defined as "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a child with a disability, including—(A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education."  20 U.S.C. § 1401(a)(16).

2. Pennsylvania defines the term "exceptional children" as "children of school age who deviate from the average in physical, mental, emotional or social characteristics to such an extent that

they require special educational facilities or services...."  Pa.Stat.Ann. tit. 24, § 13–1371(1) (1992).

The IDEA defines "children with disabilities" as children "(i) with mental retardation, hearing impairments including deafness, speech or language impairments, visual impairments including blindness, serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and (ii) who, by reason

that she did not require special education. Specifically, the MDT found that M. did exhibit symptoms consistent with ADHD, including processing weaknesses that involved fine motor control, but that she had strong verbal skills and her ability and achievement levels were average or above average. The MDT concluded that M. could be educated in a regular classroom as long as her school program addressed " 'her strong verbal skills, her weak motor skills, and her difficulty with impulsivity and inattention and hyperactivity (which often lead to disorganization).' " *Id.* at 3 (quoting Record at 321a).

On June 9, 1992, an Individual Education Program ("IEP") team met with the appellants to discuss the MDT report.[3] Mem. at 4. The IEP team agreed with the MDT's evaluation that M. was not exceptional and not in need of special education. The team concluded that, in spite of her weaknesses, M. could sustain herself in a regular academic curriculum with proper assistance from her parents and teachers. *Id.* The team then developed a Notice of Recommended Assignment ("NORA"), which consisted of written program "suggestions" to M.'s regular education teachers. *Id.*

The appellants refused to approve the school district's NORA, which was offered to them on June 18, 1992. Mem. at 5. Instead, they requested a pre-hearing conference and an independent evaluation of M. at the school district's expense. On July 26, 1992, the appellants requested an administrative due process hearing pursuant to the IDEA, 20 U.S.C. § 1415(b)(1)(E).[4] *Id.*

A Pennsylvania Special Education Hearing Officer conducted the due process hearing on September 17 and September 28, 1992. The appellants presented two issues: (1) whether, under Pennsylvania law, M. is a mentally gifted child suffering from a specific learning disability who is entitled to special education services; and (2) whether the appellants were entitled to reimbursement for an independent psychological evaluation of M. Mem. at 5. The appellants argued that despite M.'s achievement of academic success in the regular classroom, she was functioning below her intellectual ability and, therefore, required special education. *Id.* at 5–6. On October 11, 1992, the hearing officer decided in appellants' favor. Specifically, the hearing officer found that M. both was gifted mentally and afflicted with a specific learning disability, and that she thereby was entitled to special education. *Id.* at 7.

The school district appealed the hearing officer's decision to the Pennsylvania Special Education Appeals Panel, which reversed the hearing officer's findings on November 28, 1992. Mem. at 7. The appeals panel concluded that: (1) the record did not support the hearing officer's finding that M. was mentally gifted but learning disabled; (2) the hearing officer based his decision on faulty legal assumptions; (3) the opinion of the appellants' expert witness, upon which the hearing officer relied in making his determination, was "rambling and confusing"; and (4) the appellants were not entitled to reimbursement for the expert's "independent evaluation." *Id.* at 7–8. Shortly after the appeals panel issued its decision, the appellants withdrew M. from public school and placed her in a private school that specializes in educating children with learning disabilities. *Id.* at 8.

thereof, need special education and related services." 20 U.S.C. § 1401(a)(1)(A).

In Pennsylvania, the term "exceptional" is used to refer both to students who are mentally gifted and in need of special education and students who have one of the 11 disabilities recognized under the IDEA and who, as a result thereof, require special education. *See* 22 Pa.Code §§ 14.1 (definitions of "exceptional student" and "eligible student"); 342.1(b) (definition of "mentally gifted") (1994). The IDEA does not include the concept of "mentally gifted" within its definition of "children with disabilities." *See* 20 U.S.C. § 1401(a)(1)(A).

3. Under Pennsylvania law, an IEP team must make the final determination of whether a student is eligible for special education. *See* 22 Pa.Code §§ 14.32, 342.32 (1994).

4. The district court seems to have mistakenly treated the school district's list of recommendations (NORA) for M. as an Individual Education Program (IEP). *See* Mem. at *passim.* The parties have stipulated that the district court was in error. *See* Joint Stipulation, app. at 126. We describe an IEP, which is far more comprehensive than a NORA, later in this opinion.

## B. PROCEDURAL HISTORY

On August 27, 1993, the appellants filed a civil action against the school district in the district court. The appellants alleged violations of: the IDEA; section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq.; the Civil Rights Act, 42 U.S.C. § 1983; and the Pennsylvania Public School Code of 1949, Pa.Stat.Ann. tit. 24, §§ 1–101 et seq. (1992). Mem. at 8–9. Specifically, they alleged that the school district had failed to evaluate M. adequately and classify her as disabled, and that M. therefore had been denied her right to receive special education. The appellants sought compensatory damages in the form of reimbursement of private school tuition and reimbursement of fees incurred for doctors and psychological evaluations; punitive damages; attorneys' fees and costs; and an order requiring the school district to provide appropriate special education services to M. Id.

On March 16, 1994, the school district filed a "Motion for Disposition Under Section 1415(e) of the Individuals with Disabilities Act," in which it argued: (1) that the court should affirm the decision of the appeals panel based on the administrative record without hearing additional evidence; and (2) that the court should dismiss the appellants' additional statutory claims.[5] Mem. at 9.

The appellants argued in response that the court should not dismiss their case on the administrative record because they had significant additional evidence to submit that was not available at the time of the administrative hearing, including the testimony of M.'s private school teachers and expert witnesses regarding her disability.[6] Id. The appellants also argued that if their IDEA claim was found to be invalid, the court should not dismiss their non-IDEA claims. Id. at 9–10.

The district court held a hearing on June 2, 1994.[7] Without further proceedings, the court issued its Memorandum and Order of September 26, 1994, in which it ruled that it would accept no additional evidence. Mem. at 12. Further, with respect to the IDEA claim, the court ruled in favor of the school district on the record of the administrative proceedings and affirmed the order of the appeals panel. Id. at 21. Finally, the district court dismissed all other statutory claims on the grounds that the IDEA preempted them. Id. at 10–11. The appellants then timely appealed to this court.

## II. DISCUSSION

### A. THE IDEA

In 1975, Congress provided that it would make funds available for state special edu-

---

5. The school district's "Motion for Disposition" to the district court also sought dismissal of the appellants' claims on the grounds that they were time-barred. See Mem. at 9. The district court, however, did not make a ruling on this claim, nor have the parties raised the issue in this court.

6. Although the appellants never made a formal proffer of this additional evidence, they did describe it in their Brief in Opposition to Defendant's Motion for Disposition, see app. at 53–57, and described it briefly at the June 2, 1994 hearing in the district court, see app. at 90. In any event, it is clear that the district court understood appellants' wish to offer such evidence, as it ruled on the offer in its memorandum opinion. See Mem. at 12. The school district's claim at oral argument that appellants had not adequately made known their wish to submit additional evidence is thus without merit.

7. In their brief, appellants claim that the June 2, 1994 hearing was intended only to address the issue of "whether [they] would be permitted to offer additional evidence." Appellants' br. at 5. In contrast, the district court stated that, "[a]t the hearing, both parties agreed that the court's

determination of the District's motion would determine whether a trial was necessary," and that "[t]he parties agreed that if the court granted the District's motion and decided not to hear additional evidence, the court could decide this case based on the administrative record." Mem. at 10. Because we will remand this case for the evaluation of and possibly the taking of additional evidence, we need not address this factual dispute. However, we do note that the docket in the district court indicates that the court granted appellants' "Motion for a Pretrial Conference" (emphasis added) on May 26, 1994, and that the court scheduled the conference for June 2, 1994. See app. at 4 (Docket No. 13). Moreover, the transcript of the June 2, 1994 hearing contains repeated references to a trial, one purportedly to be conducted at some future date. See, e.g., app. at 89–91, 122. Because neither the docket nor the transcript of the June 2, 1994 hearing contains an explicit statement that the district court would dispose of the case on the merits without proceeding to trial, appellants' confusion as to this point seems to be justified.

cation programs on the condition that states implement policies assuring a "free appropriate public education" for all their disabled children. 20 U.S.C. § 1412(1). Congress passed the law known today as the Individuals with Disabilities Education Act "to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs[.]" *Id.* § 1400(c). As we recently reaffirmed in *W.B. v. Matula,* 67 F.3d 484 (3d Cir.1995), "[a] free, appropriate public education 'consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child "to benefit" from the instruction.' " 67 F.3d at 491 (quoting *Board of Educ. v. Rowley,* 458 U.S. 176, 188–89, 102 S.Ct. 3034, 3042, 73 L.Ed.2d 690 (1982)).

The Act defines disability broadly. That term includes, but is not limited to, children "with mental retardation, hearing impairments including deafness, speech or language impairments, visual impairments including blindness, serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities...." 20 U.S.C. § 1401(a)(1)(A). Section 1401(a)(15) defines a set of "specific learning disabilities" that extends the class of covered students to include those with:

> [A] disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations. Such disorders include such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. Such term does not include children who have learning problems which are primarily the result of visual, hearing, or motor disabilities, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage.

20 U.S.C. § 1401(a)15. States wishing to receive funding under the IDEA must ensure that "all children residing in the State who are disabled, regardless of the severity of their disability, and who are in need of special education and related services are identified, located, and evaluated" by the state. 20 U.S.C. §§ 1412(2)(C), 1414(a)(1)(A); *see also* 34 C.F.R. §§ 300.128(a)(1) & note 1, 300.220 & note, 300.300 note 3. This obligation is known as the "child find" duty. *Matula,* 67 F.3d at 492.

The primary mechanism for delivering a free appropriate education is the development of a detailed instruction plan, known as an Individual Education Program ("IEP"), for each child classified as disabled. 20 U.S.C. § 1401(a)(18). An IEP consists of, *inter alia,* a specific statement of a student's present abilities, goals for improvement, services designed to meet those goals, and a timetable for reaching the goals via the services. *Id.* § 1401(a)(20). The creation of an administrative structure capable of producing IEPs is a requisite to receiving IDEA funds. *Id.* § 1414(a)(5). To the extent possible, however, a school must "mainstream" disabled students—that is, instruct them in a regular, not special, education setting. *Id.* § 1412(5).

The IDEA authorizes federal reviews of state and local compliance, *see* 34 C.F.R. §§ 104.61, 100.7, and affords certain procedural safeguards to the parents of disabled children. *Inter alia,* parents may examine all relevant records concerning evaluation and placement of their children, 20 U.S.C. § 1415(b)(1)(A); must receive prior written notice when a school proposes or refuses to alter a placement, § 1415(b)(1)(C); may contest in an impartial due process hearing decisions regarding the evaluation of their child or the appropriateness of the child's program, §§ 1415(b)(1)(E), 1415(b)(2); may appeal the decision from such a hearing to the state education agency, § 1415(c); and may obtain judicial review of the administrative decision, § 1415(e)(2). *See Matula,* 67 F.3d at 492; *Bernardsville Bd. of Educ. v. J.H.,* 42 F.3d 149, 158 & n. 13 (3d Cir.1994); *Lester H. v. Gilhool,* 916 F.2d 865, 869 (3d Cir.1990), *cert. denied,* 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991). Pennsylvania fulfills its IDEA obligations through a complex statuto-

ry and regulatory scheme codified at Pa.Stat. Ann. tit. 24, §§ 13–1371 and 13–1372 (1992), and 22 Pa.Code §§ 14.1 to 14.74, 342.1 to 342.74 (1994).

## B. JUDICIAL REVIEW UNDER THE IDEA

■ As we noted above, the appellants brought this action against the school district after requesting an administrative due process hearing before a Pennsylvania Special Education Hearing Officer to satisfy a requirement of the IDEA, 20 U.S.C. §§ 1415(b)(1)(E), 1415(b)(2). Mem. at 5. After the hearing officer decided in appellants' favor, the school district appealed his decision to the Pennsylvania Special Education Appeals Panel, which ruled in its favor. *Id.* at 7. Accordingly, the appellants exhausted the IDEA's provisions for administrative review, *see* section 1415(c), and thus were entitled to bring this civil action. *See* section 1415(e)(2). It is the nature of that judicial proceeding, in particular the extent to which the court is required to receive evidence beyond that contained in the administrative record, that the parties now principally dispute.

We approach this question by first addressing the judicial review provision of the IDEA, section 1415(e)(2), which provides in relevant part:

> Any party aggrieved by the findings and decision made under subsection ... shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in ·any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(e)(2). In determining the scope of a district court's review under the IDEA, the Supreme Court has stated that the statute's language instructing that the district court, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate," does not mean that courts are free to substitute their own notions of sound education policy for those of the educational agencies they review, but rather that they should give "due weight" to the administrative proceedings. *Board of Educ. v. Rowley,* 458 U.S. at 205–06, 102 S.Ct. at 3050–51; *see also Fuhrmann v. East Hanover Bd. of Educ.,* 993 F.2d 1031, 1034 (3d Cir.1993). Naturally, the requirement that the courts give "due weight" to administrative proceedings has obliged the district courts to determine how much weight is "due." *See Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir.1995).

■ The Court of Appeals for the Ninth Circuit has observed that "judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1471 (9th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 90, 130 L.Ed.2d 41 (1994). Because the IDEA specifically requires a district court to "receive the records of the administrative proceedings, ... hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence," grant any appropriate relief, 20 U.S.C. § 1415(e)(2), a district court "does not use the substantial evidence standard typically applied in the review of administrative agency decisions, 'but instead must decide independently whether the requirements of the IDEA are met.'" *Murray v. Montrose County Sch. Dist.,* 51 F.3d 921, 927 (10th Cir.1995) (quoting *Board of Educ. v. Illinois State Bd.,* 41 F.3d 1162, 1167 (7th Cir.1994)).

The courts of appeals differ in their description of the interplay between the Supreme Court's "due weight" interpretation and the IDEA's provision for independent judicial review. As the Court of Appeals for the Tenth Circuit recently summarized,

> [t]he district court must ... independently review the evidence contained in the administrative record, accept and review ad-

ditional evidence, if necessary, and make a decision based on the preponderance of the evidence, while giving 'due weight' to the administrative proceedings below. This has been described as a 'modified *de novo* review,' or as 'involved oversight.'

*Murray,* 51 F.3d at 927 (citations omitted). The Court of Appeals for the First Circuit has described judicial review under the IDEA as follows: "Congress intended courts to make bounded, independent decisions— bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court[.]" *Town of Burlington v. Department of Educ.,* 736 F.2d 773, 791 (1st Cir.1984), *aff'd on other grounds,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

We have not spoken definitively on what constitutes "due weight" under the *Rowley* standard, and need not do so today. We, however, have referred to the interpretation of the standard first developed by the Court of Appeals for the First Circuit:

> [T]he question of the weight due the administrative findings of facts must be left to the discretion of the trial court. The traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence, does not apply. This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole.

*Burlington,* 736 F.2d at 791–92; *see Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 527 (3d Cir.1995) ("[D]istrict courts have discretion to determine how much deference to accord the administrative proceedings[.]"); *Bernardsville,* 42 F.3d at 161 (quoting *Burlington*); *Oberti v. Board of Educ.,* 995 F.2d 1204, 1219 (3d Cir.1993) ("[T]he amount of deference to be afforded the administrative proceedings 'is an issue left to the discretion of the district court.'") (quoting *Jefferson*

*County Bd. of Educ. v. Breen,* 853 F.2d 853, 857 (11th Cir.1988)); *Fuhrmann,* 993 F.2d at 1042 (Hutchinson, J., concurring and dissenting).

The district court relied on *Rowley* for its determination that "[w]hile the court may, at its discretion, hear additional evidence, it must give 'due weight' to the administrative proceedings and the education experience and expertise applied therein." Mem. at 11. The district court thereafter concluded that "the proper exercise of discretion move[d] it to decline to second-guess the judgment of the administrative panel with evidence that was not before the panel when it made its decision," Mem. at 12. Accordingly, the district court ruled on the merits of the appellants' case without evaluating or accepting their proffer of additional evidence. *Id.* The district court thus seems to have interpreted *Rowley* to limit severely the IDEA's directive in section 1415(e)(2) that, on judicial review, a court "shall hear additional evidence at the request of a party."

■ Our review of a district court's legal analysis is plenary. However, our review here "must be conducted within the general framework of deference to state decisionmakers" that is dictated by the IDEA and by the Supreme Court's direction in *Rowley. Fuhrmann,* 993 F.2d at 1032 (citing *Wexler v. Westfield Bd. of Educ.,* 784 F.2d 176, 181 (3d Cir.), *cert. denied,* 479 U.S. 825, 107 S.Ct. 99, 93 L.Ed.2d 49 (1986)); *see also Carlisle,* 62 F.3d at 526 ("We, of course, exercise plenary review over the district court's conclusions of law and review its findings of fact for clear error."). In view of a district court's scope of review under section 1415(e)(2) which goes beyond the traditional deferential standard, and in view of the provision in that section for the court to hear additional evidence at the request of a party, we hold that the district court erred in concluding that it is within a court's discretion summarily to exclude altogether the consideration of additional evidence submitted by a party. Consequently, we are obliged to vacate its order and remand the matter for further proceedings. We turn, then, to a consideration of what additional evidence may be introduced on the remand.

## C.  ADDITIONAL EVIDENCE

The Court of Appeals for the First Circuit, in *Burlington,* 736 F.2d 773, seems to have been the first court of appeals to analyze the IDEA's directive that a district court "shall hear additional evidence at the request of a party." *Id.* at 790.  There, the court held that the word "additional" should be construed in the ordinary sense of the word to mean "supplemental." *Id.* Thus construed, the act:

> [C]ontemplates that the source of the evidence generally will be the administrative hearing record, with some supplementation at trial.  The reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing.  The starting point for determining what additional evidence should be received, however, is the record of the administrative proceeding.

*Id.* In providing examples of types of additional evidence that might be relevant to judicial review under the IDEA, the *Burlington* court did not limit admissible evidence to those types enumerated, which interpretation the school district would have us make. *See* appellee's br. at 12–13. In contrast, the court seems merely to have provided examples of additional evidence that a court could find relevant to IDEA matters on judicial review.

Although we never explicitly have interpreted the phrase, we recently referred to the *Burlington* construction of "additional evidence" in *Bernardsville,* 42 F.3d at 161, where we upheld a district court's decision to exclude evidence as cumulative and an improper embellishment of testimony previously given at an administrative hearing. *See also Oberti,* 995 F.2d at 1220 (court makes fact findings in IDEA case not only on administrative record, but also on any new evidence presented by parties); *Wexler v. Westfield Bd. of Educ.,* 784 F.2d at 181 (court must independently review the record, hear any requested additional evidence, and apply the preponderance standard).  Other courts of appeals have followed *Burlington*'s lead in construing section 1415(e)(2)'s "additional evidence" clause, *see, e.g., Ojai,* 4 F.3d at 1473 (upholding district court's admission of additional evidence concerning relevant events occurring subsequent to the administrative hearing), although the interpretation is not unanimous. *See Metropolitan Gov't of Nashville v. Cook,* 915 F.2d 232, 234 (6th Cir.1990) ("Insofar as [the language in *Burlington* ] suggests that additional evidence is admissible only in limited circumstances, such as to supplement or fill in the gaps in the evidence previously introduced, we decline to adopt the position taken by the First Circuit."); *see also Murray,* 51 F.3d at 930–31 & n. 15.

Although we make no explicit interpretation of section 1415(e)(2)'s "additional evidence" clause, even under *Burlington*'s restrictive approach a district court first must evaluate a party's proffered evidence before deciding to exclude it.  Moreover, while the purpose of the *Burlington* construction is to "structurally assist[ ] in giving due weight to the administrative proceeding, as *Rowley* requires," *Burlington,* 736 F.2d at 790, the court of appeals did not say that a district court arbitrarily or summarily could exclude additional evidence submitted by a party in pursuit of that deference.  On the contrary, the examples that *Burlington* provided of additional evidence that should *not* be admitted were all types of evidence that courts might decide to exclude in a conventional civil proceeding.  For instance, the court stated that the additional evidence clause "does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony; this would be entirely inconsistent with the usual meaning of 'additional.' " *Id.* Even while making this statement, though, the court stressed that it would not be wise to devise a hard-and-fast rule:

> We decline to adopt the rule urged by defendants that the appropriate construction is to disallow testimony from all who did, or could have, testified before the administrative hearing.  We believe that, although an appropriate limit in many cases, a rigid rule to this effect would

unduly limit a court's discretion and constrict its ability to form the independent judgment Congress expressly directed. A salient effect of defendants' proposed rule would be to limit expert testimony to the administrative hearing. Our review of the cases involving the Act reveals that in many instances the district court found expert testimony helpful in illuminating the nature of the controversy and relied on it in its decisional process. There could be some valid reasons for not presenting some or all expert testimony before the state agency.

*Id.* at 790–91.

Thus, the *Burlington* court stated that certain evidence may be excluded under IDEA judicial review out of deference to the administrative proceedings. The court, however, declined to devise a bright-line rule, choosing instead to leave "the question of the weight due the administrative findings of fact" to the discretion of the trial court. *Id.* at 791–92. Other courts, including ours, likewise have condoned the exclusion of additional evidence submitted by the parties to an IDEA proceeding when, for a particular reason, the court properly could exclude the evidence. *See, e.g., Bernardsville,* 42 F.3d at 161 (upholding exclusion of evidence as cumulative and improper embellishment of testimony previously given at administrative hearing).

It is regularly held that the question of what additional evidence to admit in an IDEA judicial review proceeding, as well as the question of the weight due the administrative findings of fact, should be left to the discretion of the trial court. *See, e.g., Carlisle,* 62 F.3d at 527; *Bernardsville,* 42 F.3d at 161; *Oberti,* 995 F.2d at 1219; *Burlington,* 736 F.2d at 791–92. As appellants note, Congress' central goal in enacting the IDEA was to ensure "that each child with disabilities has access to a program that is tailored to his or her changing needs and designed to achieve educational progress." Appellants' br. at 11. Children are not static beings;

neither their academic progress nor their disabilities wait for the resolution of legal conflicts. While a district court appropriately may exclude additional evidence, a court must exercise particularized discretion in its rulings so that it will consider evidence relevant, non-cumulative and useful in determining whether Congress' goal has been reached for the child involved. Consequently, on the remand the district court should use this standard in determining whether to admit the proffered additional evidence, *i.e.,* would the evidence assist the court in ascertaining whether Congress' goal has been and is being reached for the child involved.[8]

### D. FUHRMANN V. EAST HANOVER BOARD OF EDUCATION

We consider one final matter with respect to the "additional evidence" clause of the IDEA. In deciding to rule on the merits of appellants' IDEA claims without evaluating or accepting their offer of additional evidence, the district court relied on our holding in *Fuhrmann,* 993 F.2d 1031, in addition to relying on the Supreme Court's decision in *Rowley. See* Mem. at 11–12. The district court cited *Fuhrmann* for the proposition that "the court cannot assess the adequacy of a student's placement 'at some later date when one has the benefit of the child's actual experience,'" Mem. at 11 (quoting *Fuhrmann,* 993 F.2d at 1040), but instead "must measure the adequacy of an educational program at the time it was offered to the student." Mem. at 12 (citing *Fuhrmann,* 993 F.2d at 1040). As the appellants "proposed that they be allowed to supplement the record with additional evidence which was not available in 1992," the district court chose to address the merits of their case without evaluating or admitting that evidence because in the eyes of the district court, doing so would be "second-guess[ing] the judgment of the administrative panel with evidence that was not before the panel when it made its decision." Mem. at 12. The court proceeded to "confine its analysis to the evidence that was

8. Because we vacate the judgment of the district court and remand the case for the district court's evaluation of additional evidence, which may lead to the admission of some, none, or all of the evidence submitted, it is not necessary for us to address appellants' claim that the district court denied them a fair opportunity to argue their case. The remand necessarily resolves that issue.

before the panel in 1992, and ... give due deference to the [administrative] panel's findings." *Id.* In order to address completely appellants' claim for relief, we must revisit the evidentiary issues we considered in *Fuhrmann.*[9]

In *Fuhrmann,* we addressed the claim of parents of a child with disabilities for reimbursement for two years of private schooling for their son. The parents contended that the individual education programs that the school district had offered to the child were inappropriate and thus violated the IDEA.[10] Neither party sought to introduce additional evidence in *Fuhrmann,* 993 F.2d at 1034 n. 3. The issue, instead, was the weight that the district court should give to evidence already in the administrative record regarding the child's progress in private school (evidence amassed after the school district's decision regarding the IEP but before the parents sought judicial review). *Id.* at 1039. As appellants note, we held in *Fuhrmann* that the district's liability hinged upon whether its proposed program for the child was, at the time it was offered, "reasonably calculated"

to benefit the child. Appellants br. at 19. Appellants interpret our ruling as follows:

The Court declined, therefore, to adopt a rule under which the district would have been financially penalized for an IEP that, while apparently appropriate at the time it was developed, turned out in hindsight to be inadequate. Accordingly, the Court held, evidence of the child's subsequent educational progress (or lack thereof) could be considered only insofar as it bore on the issue of whether the IEP was appropriate when it was created.

Appellants' br. at 20 (citing *Fuhrmann,* 993 F.2d at 1040).

Appellants' characterization of our holding in *Fuhrmann* is fair. The case was unusual in that the panel authored three separate opinions: one opinion by Judge Garth for the court, one concurring opinion by Judge Mansmann, and one concurring and dissenting opinion by Judge Hutchinson. On the matter of what weight to give evidence not before a school district when it originally made the decision regarding the educational placement of a child, Judge Garth and Judge

---

**9.** Appellants try to minimize the applicability of *Fuhrmann* to this case by pointing out that the major thrust of their claim is "for a prospective determination of eligibility for services," appellants' br. at 20. They continue:

It may well be unfair to force a district to pay reimbursement where it correctly identified the child as eligible and developed an IEP reasonably calculated to produce progress, even if, in hindsight, progress did not actually occur. But there is nothing unfair about parents trying to convince a court that their child should be declared—at least from that point forward—to have a disability, and nothing irrelevant about evidence that brings the court up to date on whether indicia of a disability are present.

Appellants' br. at 20–21. Although appellants try to convince us that we need not address *Fuhrmann*'s effect on their claims, *see* br. at 21 n. 10 ("[T]he Court need not decide these points."), appellants, as they admit, did include claims for reimbursement in their complaint in the district court. Br. at 20 n. 9. Thus, we must address *Fuhrmann*'s holding to see if what appellants seek is truly the "unfair" use of hindsight in judging the school district's decision regarding M.'s eligibility for special education.

**10.** Appellants again try to distinguish their case from *Fuhrmann* by pointing out that "[u]nlike the [appellants] here, the parents in *Fuhrmann*

were not seeking a determination of eligibility for special education, or a finding concerning the program that would be appropriate for their child in the future." Appellants' br. at 19. We decline, however, to draw such a bright line between the appropriateness of taking additional evidence in an IDEA judicial review proceeding when the reasonableness of an IEP is at issue and taking such evidence in a proceeding where the initial determination of eligibility for special education is being litigated. However, we do note that Congress' primary purpose in enacting the IDEA did seem to be the assurance of access to special education services for children with disabilities. *See* 20 U.S.C. § 1400(c) ("It is the purpose of this chapter to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs[.]"). But we also note that in *W.B. v. Matula,* 67 F.3d 484, we recently held that the IDEA allows the recovery of damages as rather broadly defined. 67 F.3d at 494-495. Obviously, a court would have to exercise great care in admitting after-acquired evidence in a damages action, particularly one such as this case, which involves a claim for punitive damages. Thus, while we are not drawing bright lines, we do observe that a more liberal approach might be appropriate in a case involving a claim for remedial educational relief as contrasted to a damages action.

Mansmann agreed on the aforementioned holding: "[T]he measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." 993 F.2d at 1040. However, despite Judge Garth's statement that "Judge Mansmann and I are in complete agreement as to the time when we must look at the 'reasonable calculation' made pursuant to *Rowley*," *id.*, the two judges may have come to different conclusions as to the consequences of that holding. While Judge Garth stated that "evidence of a student's later educational progress may only be considered in determining *whether the original IEP was reasonably calculated to afford some educational benefit*," *id.* (emphasis added), Judge Mansmann concluded that "evidence of what took place after the hearing officer rendered his decision in the fall of 1989 is not relevant in deciding whether [the child's] 1989–90 placement was appropriate." *Id.* at 1041 (Mansmann, J., concurring). Judge Garth thus seemed to take the less restrictive approach, one that would admit evidence dating from a time after both the school district and the hearing officer made their decisions, but only in determining the reasonableness of the school district's original decision. Judge Mansmann's opinion could be read to indicate that she would not admit such evidence at all, and the school district advances that reading. *See* appellee's br. at 10 n. 3.

■ In light of the IDEA's purpose "to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services," 20 U.S.C. § 1400(c), in addition to its directive to "hear additional evidence at the request of a party," *id.* § 1415(e)(2), we believe that Judge Garth's interpretation of the statute should control the taking of evidence on judicial review that was not before the school district when it made its initial IDEA placement decisions. In so concluding, however, we stress that such after-acquired evidence, such as information received through the experience of an alternative placement, should be used by courts only in assessing the reasonableness of the district's initial decisions regarding a particular IEP or the provision of

special education services at all. Courts must be vigilant to heed Judge Garth's warning that "[n]either the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." 993 F.2d at 1040.

The dangers inherent in this process of second-guessing the decisions of a school district with information to which it could not possibly have had access at the time it made those decisions are great. As appellants recognize, it indeed would be unfair "to adopt a rule under which [a] district would [be] financially penalized for an IEP that, while apparently appropriate at the time it was developed, turned out in hindsight to be inadequate." Appellants' br. at 20. Our recent holding in *Carlisle*, 62 F.3d at 534, is not inconsistent with these conclusions, for in that case we merely emphasized the prospective nature of judging the appropriateness of a particular IEP, and cited *Fuhrmann* for the prospect that a student's subsequent failure to make progress in school does not retrospectively render an IEP *per se* inappropriate. In *Carlisle*, we did not address specifically the issue of how to use after-acquired evidence in assessing the reasonableness of an IEP—a judicial process that, by the very nature of judicial review, must occur after the formulation of the educational program.

■ In remanding this case to the district court, then, we hold that it was not within that court's discretion to reject appellants' offer of additional evidence without even evaluating it for its admissibility. However, we also note that, because at least some of appellants' proffered additional evidence was acquired after the school district's decision regarding M.'s need for special education, the district court will need to examine such evidence carefully. Such evidence may be considered only with respect to the *reasonableness* of the district's decision at the time it was made. Of course, this caveat does not mean that the court cannot exclude evidence that could have been available when the school district made its decision.

## E. THE PREEMPTIVE EFFECT OF THE IDEA

■ Finally, appellants contend that the district court erroneously dismissed their additional statutory claims as "preempted" by the IDEA. We agree.

Section 1415(f) of the IDEA states:

Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973 [29 U.S.C. § 790 et seq.], or other Federal statutes protecting the rights of children and youth with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(f). In its Memorandum Opinion, the district court interpreted this section of the IDEA to mean that "parents must first challenge [an] educational program under the IDEA before they may pursue a civil action alleging additional causes of action." Mem. at 10–11. The court thereafter concluded that the appellants' additional statutory claims were "clearly pre-empted by § 1415(f)" and therefore should be dismissed. *Id.* at 11.

■ The district court's dismissal of appellants' additional statutory claims was a legal determination over which we exercise plenary review. *Carlisle*, 62 F.3d at 526; *Fuhrmann*, 993 F.2d at 1033. While section 1415(f) requires a party to exhaust the IDEA's administrative remedies before pursuing other claims, the section makes clear that the IDEA is not the exclusive avenue through which children with disabilities can assert claims for an appropriate education. *W.B. v. Matula*, 67 F.3d at 493–494; *Hayes v. Unified Sch. Dist.*, 877 F.2d 809, 812 (10th Cir.1989); *Board of Educ. v. Diamond*, 808 F.2d 987, 995 (3d Cir.1986).

Indeed, Congress amended the IDEA in 1986 to include section 1415(f) in response to the Supreme Court's decision in *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), which held that the IDEA was the exclusive statute through which a disabled child could obtain relief. *See* The Handicapped Children's Protection Act of 1986, Pub.L. No. 99–372 § 3, 100 Stat. 796, 797 (1986). Section 1415(f) thus clarified Congress' intent with regard to the preemptive effect of the IDEA. *Diamond*, 808 F.2d at 995. As we recently stated, "Section 1415(f) was ... enacted to 'reaffirm, in light of [*Smith*], the viability of section 504, 42 U.S.C. § 1983, and other statutes as separate vehicles for ensuring the rights of handicapped children.'" *Matula*, 67 F.3d at 493–494 (quoting H.R.Rep. No. 99–296, 99th Cong., 1st Sess. 4 (1985)); *see also Mrs. W. v. Tirozzi*, 832 F.2d 748, 754–55 (2d Cir.1987).

Thus, the district court erred in dismissing the appellants' additional statutory claims as preempted by the IDEA. While the school district states that "the lower court appears to have overlooked Section 1415(f) of the IDEA" in so ruling, appellee's Br. at 18, it claims that "the record simply does not support the maintenance of a cause of action against appellees on any other theory." *Id.* But even though this assertion may be established on remand, it was not within the district court's discretion to dismiss the appellants' claims without addressing their merits. Accordingly, we will vacate the order of the district court dismissing appellants' additional statutory claims.

## III. CONCLUSION

For all the reasons detailed above, we will vacate the district court's order entered September 27, 1994. We will remand the case to the district court for the evaluation and, perhaps, depending on that evaluation, the taking of additional evidence on the IDEA claim and for further proceedings consistent with this opinion. Costs shall be allowed the appellants.