NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

No. 11-3014
_____

L.G., o/b/o E.G.
E.G., o/b/o E.G. ,
                                        Appellants
                    v.

FAIR LAWN BOARD OF EDUCATION

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-09-cv-06456)
District Judge: Honorable Dennis M. Cavanaugh

_____

Submitted Under Third Circuit LAR 34.1(a)
April 23, 2012

Before: SLOVITER and ROTH, Circuit Judges, and POLLAK, District Judge[*]

(Opinion filed: June 28, 2012)
_____

OPINION
_____

---

[*] Honorable Louis H. Pollak, Senior Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation. Judge Pollak died on May 8, 2012; this opinion is filed by a quorum of the court. 28 U.S.C. § 46 and Third Circuit IOP 12.1(b).

SLOVITER, *Circuit Judge*.

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, mandates that states establish procedures by which, "[t]o the maximum extent appropriate," children with disabilities are educated together with nondisabled children. 20 U.S.C. § 1412(a)(5)(A). Appellants E.G. and L.G. are the parents of E.G. ("L."),[1] who has been diagnosed with pervasive developmental disorder and autism spectrum disorder. At the heart of the present dispute is a proposed individualized education program ("IEP") written for L. by the Fair Lawn Board of Education ("Fair Lawn") that did not specifically provide for interaction with typically developing peers. L.'s parents petition this court for review of a decision of the United States District Court for the District of New Jersey granting summary judgment to Fair Lawn on L.'s parents' claim for reimbursement of the costs associated with their placement of L., contrary to the provisions of Fair Lawn's proposed IEP, in an "inclusive" preschool, attended both by children with disabilities and those without. For the reasons given below, the District Court's decision will be affirmed.

## I.

Because we write primarily for the parties who are familiar with this case, we will provide only a brief summary of its extensive background here.

---

[1] Although the caption refers to the child as "E.G." we refer to her as "L." because that is how she is referred to in the District Court's decision.

Shortly before L.'s third birthday, Fair Lawn determined that L. qualified for special education and related services as a preschooler with a disability.[2] Fair Lawn's child study team prepared an IEP for L. that provided for placement in Fair Lawn's Stepping Stones program, which is exclusively for preschoolers with autism spectrum disorders. L.'s IEP did not provide for any interaction with children without disabilities.

L.'s mother approved the IEP, and L. began to attend Stepping Stones on January 22, 2007, her third birthday. At Stepping Stones, L. received approximately three hours per day of one-on-one discreet trial instruction based on Applied Behavioral Analysis ("ABA"), a research-based system of educating children with autism. Along with a variety of other strategies, ABA includes a "mainstreaming" component that "occurs only when the child has adequate skills to enable a meaningful interaction with a more typical peer." J.A. at 41.

For the remainder of the school day, L. participated in group activities with other children who had been diagnosed with autism spectrum disorders including some children who were higher functioning than L., who was "one of the lower functioning students" in the class. J.A. at 42.

In the fall of 2007, L.'s parents requested that Fair Lawn consider an alternative educational placement for L. that would provide her with opportunities to interact with

---

[2] Children between the ages of three and twenty-one who have disabilities, as defined at 20 U.S.C. § 1401(3), are eligible for special education and related services under the IDEA. 20 U.S.C. § 1412(a)(1)(A).

3

typically developing peers. By letter dated November 15, 2007, Fair Lawn denied the request. J.A. at 578.

At the request of L.'s parents, a meeting was convened on December 20, 2007 to discuss L.'s IEP for the coming year and, in particular, a request by L.'s parents that L. be placed at the Children's Center, an inclusive preschool at Montclair State University, rather than at Stepping Stones. In support of their placement request, L.'s parents provided Fair Lawn with reports of assessments of L. they had obtained at their own expense. The parents also provided Fair Lawn with a video of L. in an environment that included typically developing peers, which they believed showed that L. was ready for, and would benefit from, interaction with typically developing peers.

Prior to the December 20, 2007 meeting, Fair Lawn Staff met to develop a proposed IEP. The proposed IEP, which was presented to L.'s parents at the December 20, 2007 IEP team meeting, continued to provide for L.'s placement at Stepping Stones without specifically providing for any interaction with nondisabled children. According to Fair Lawn, L. did not have the requisite skills to benefit from placement in an inclusion program or from any interaction with typically developing peers. L.'s case manager later explained that "before children are integrated into a program like [the Children's Center] they would need to show some social-interaction skills, some awareness of other children, some modeling of other children, and some interest in engaging with other children," which L. had not shown. J.A. at 49. The IEP thus provided that Fair Lawn staff would "continue to monitor [L.'s] progress to ensure she has opportunities to interact with nondisabled peers when she is able to benefit from them." J.A. at 617. In

4

early 2008, Fair Lawn began to include "reverse-inclusion component," which "allowed a child from outside the classroom, either typical or preschool disabled, to come in to play with the group in order to demonstrate social skills, providing students with the opportunity to emulate." J.A. at 42.[3]

On March 3, 2008, L.'s parents transferred her from Stepping Stones to the Children's Center, where she would be placed in a class that included both typically developing children and children with disabilities. That day, they initiated administrative proceedings against Fair Lawn, seeking reimbursement of the expenses they incurred in placing L. at the Children's Center and in privately obtaining other services for L.

On May 6, 2008, the New Jersey Office of Administrative Law began a due process hearing. On the eleventh day of the hearing, having first solicited briefing from both parties and heard argument, the Administrative Law Judge ("ALJ") determined that the proceedings should be bifurcated: the ALJ first would decide whether Fair Lawn's placement of L. complied with the IDEA, and if he determined that it did not, he would then move on to consider whether the Children's Center was an appropriate placement. The ALJ subsequently ruled that, in the first part of the bifurcated proceedings, he would exclude evidence not relevant to the question whether Fair Lawn had offered L. a free appropriate public education in the least restrictive environment as of March 2008, when L.'s parents transferred her to the Children's Center.

---

[3] Reverse inclusion began in L.'s assigned classroom on February 25, 2008, "as previously planned." J.A. at 56. L.'s last day at Fair Lawn was March 3, 2008. *See* Appellant's Br. at 19.

In a decision dated October 5, 2009, the ALJ determined that Fair Lawn had complied with the IDEA. Based on the expert testimony and his independent review of the video of L. that her parents had provided to Fair Lawn, the ALJ found that L.'s disability "renders her incapable of being satisfactorily educated in a regular classroom, and she wouldn't benefit from the modeling behavior of her peers if she were educated with them." J.A. at 74. On this basis, the ALJ concluded that Fair Lawn had proven that it had met the least restrictive environment requirement.

Seeking independent review of the ALJ's decision, L.'s parents brought a civil action under 20 U.S.C. § 1415(i)(2) in the United States District Court for the District of New Jersey. The parties filed cross-motions for summary judgment, and L.'s parents requested that the District Court admit the evidence that the ALJ had excluded. The District Court, on June 27, 2011, granted summary judgment to Fair Lawn. In the same opinion, the Court denied L.'s request that it admit additional evidence relating to the Children's Center, determining that the evidence was not relevant to the legal issues before the Court. L's parents appeal.

## II.

### A. Jurisdiction & Standard of Review

We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review over the District Court's legal conclusions is plenary, and the District Court's factual findings are reviewed for clear error. *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). In reviewing the District Court's evidentiary rulings, we apply

6

the abuse of discretion standard.  *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 760 (3d Cir. 1995).

Appellants contend that the District Court applied the incorrect standard of review to the ALJ's decision.  In IDEA cases, a district court is required to "hear additional evidence at the request of a party" and to make its own findings by a "preponderance of the evidence," 20 U.S.C. § 1415(i)(2)(C), while giving "due weight" to the ALJ's factual determinations and "special weight" to the ALJ's credibility determinations.  *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 & n.4 (3d Cir. 2006) ("[A] District Court must accept the state agency's credibility determinations unless the nontestimonial, extrinsic evidence in the record would *justify* a contrary conclusion [and i]n this context the word 'justify' demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court." (citation and internal quotation marks omitted)). This approach has been described as "modified *de novo*" review.  *Id.* at 389.

The District Court's opinion contains a detailed and accurate description of the modified *de novo* standard of review.  However, at the end of this description, the District Court stated that it reviews the ALJ's factual findings "under a clearly erroneous standard." *L.G. & E.G. ex rel. E.G. v. Fair Lawn Bd. of Educ.*, No. 09-6456, 2011 WL 2559547, at *5 (D.N.J. June 27, 2011).  In the "Discussion" section that followed, however, the District Court explicitly stated, "the evidence as adduced by the ALJ proves by a preponderance of the evidence that L. received that to which she was statutorily

7

entitled." *Id.* at \*4.  The District Court thus appropriately applied the modified *de novo*

standard of review.[4]

## B. Reimbursement Claim

L.'s parents seek reimbursement of the costs they incurred as a result of their

placement of L. at the Children's Center.  Tuition reimbursement is an appropriate

remedy if "the public placement violated [the] IDEA and . . . the private school

placement was proper under the Act."  *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S.

7, 15 (1993).  L.'s parents contend that Fair Lawn's placement of L. violated the IDEA

because (1) Fair Lawn excluded them from meaningful participation in the determination

of L.'s placement; and (2) Fair Lawn did not provide L. with an education in the least

restrictive environment in which she could obtain a meaningful educational benefit.  We

discuss each contention in turn.

---

[4] Moreover, the lack of clarity caused by the District Court's singular reference to the "clearly erroneous" standard does not necessitate remand if the result was proper under the correct legal standard.  *See T.R & E.M.R. ex rel. N.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000).

Appellants also argue that the District Court erroneously placed the burden of proof on them, rather than Fair Lawn.  In *Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005), the Supreme Court held that the burden of proof in a challenge to an IEP is on the party seeking relief.  The *Schaffer* Court "declined to address the issue of whether a state could, by statute, place the burden exclusively on the school district." *Ramsey*, 435 F.3d at 391. A few months before L.'s parents initiated the administrative proceedings in the present case, New Jersey enacted legislation placing the burden of proof on the school district. *See* P.L. 2007, c.331 (enacted January 13, 2008) (codified at N.J. Stat. Ann. § 18A:46-1.1).  This court has yet to rule on whether a state may, as New Jersey has, shift the burden of proof to the school district by legislation.  The ALJ, citing to N.J. Stat. Ann. § 18A:46-1.1, determined that Fair Lawn had the burden of proof, J.A. at 74,  but the District Court, citing to *Schaffer*, appears to have placed the burden on L.'s parents. *Fair Lawn*, 2011 WL 2559547, at \*3.  For the purposes of this opinion, we assume Fair Lawn had the burden of proof because it is more favorable to the Appellants.

1. Predetermination of placement

L.'s parents argue that Fair Lawn violated the IDEA's procedural requirements when, prior to the December 20, 2007 IEP team meeting, Fair Lawn staff met without L.'s parents present, determined that L. should be placed at Stepping Stones, and drafted an IEP for L. reflecting this determination. In enacting the IDEA, "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982).

Although L.'s parents did not ultimately sign the IEP that was presented to them on December 20, 2007, they were not excluded from the process of determining L.'s placement, and they had an opportunity to participate in the formulation of her IEP in a meaningful way. Federal and state regulations require that the parents of a child with a disability be afforded the opportunity to participate in meetings about a child's placement; however, parents need not be included in "preparatory activities that public agency personnel engage in to develop a proposal or response to a parent proposal that will be discussed at a later meeting." 34 C.F.R. § 300.501(b); *see also* N.J.A.C. § 6A:14-2.3(l)(2). In this context, the fact that school district staff met without the child's parents to develop a proposed IEP does not constitute a procedural violation of the IDEA. *Cf. Fuhrmann ex rel. Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1036 (3d Cir. 1993) (finding no procedural violation where parents were presented with draft IEP at team meeting, discussed it, and suggested changes).

9

2. Least restrictive environment

The central question in the proceedings before the District Court and the ALJ was whether Fair Lawn's placement of L. in accordance with the December 20, 2007 IEP violated the IDEA's requirement that students with disabilities be educated in the least restrictive environment. The IDEA mandates that states establish procedures that ensure that:

> [t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). This court has interpreted 20 U.S.C. § 1412(a)(5)(A) to require that a disabled child be placed in the least restrictive environment that will provide a "meaningful educational benefit." *Kingwood*, 205 F.3d at 578. The requirement applies with equal force to the placement of preschool-aged children. *Id*. at 579; *see also* 34 C.F.R. § 300.116(a)(2). Courts deciding whether this requirement has been met must avoid "Monday Morning Quarterbacking" and must evaluate the reasonableness of a school district's decision at the time that it was made. *Susan N.*, 70 F.3d at 762 (internal quotation marks and citation omitted).

Appellants argue that the District Court conflated the standard for determining whether L.'s IEP provided for a free and appropriate education with the standard for determining whether she was being educated in the least restrictive environment. Whether an education is "appropriate" for the purposes of determining whether a school

10

district has offered a student a free and appropriate public education is, of course, a distinct question from whether the student has been integrated "to the maximum extent appropriate." *Ramsey*, 435 F.3d at 393. Although the District Court did not engage in a separate analysis of the least restrictive environment requirement and did not make any factual findings about Fair Lawn's compliance with the requirement, it affirmed as "legally sufficient" the ALJ's determination that Fair Lawn's IEP met the requirement. On review, we apply the legal standards that the District Court should have applied, and may affirm the District Court's decision if the result was proper and supported by the factual findings of the ALJ. *See Kingwood*, 205 F.3d at 577; *Bucks Cnty. Dep't of Mental Health/Mental Retardation v. Pennsylvania*, 379 F.3d 61, 65 (3d Cir. 2004).

In determining compliance with the least restrictive environment requirement, courts in the Third Circuit apply the two-part test adopted in *Oberti ex rel. Oberti v. Board of Education of Clementon School District*, 995 F.2d 1204, 1215 (3d Cir. 1993). First, a court inquires "whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily." *Id.* (internal quotation marks and citation omitted). If a court finds that the child cannot be satisfactorily educated in a regular classroom with supplementary aids and services, it turns to the second part of the *Oberti* test: "whether the school has mainstreamed the child to the maximum extent appropriate, i.e., whether the school has made efforts to include the child in school programs with nondisabled children whenever possible." *Id.* at 1215 (internal quotation marks and citation omitted).

11

In the present case, the ALJ's findings of fact were sufficient to determine that Fair Lawn reasonably concluded that the completely segregated environment provided for in L.'s IEP was the least restrictive environment in which L. could obtain a "meaningful educational benefit." *See Kingwood*, 205 F.3d at 578.[5] In particular, the ALJ found that L. "did not have the prerequisite skills for a less restrictive environment" such as a regular classroom, that she "demonstrated inappropriate and stigmatizing behaviors," and that she "would wander aimlessly if not in a highly structured environment." J.A. at 70-71.

The ALJ also concluded that L. "would not have benefited from a less restrictive environment . . . [because she] wouldn't notice her peers, and, therefore, would not gain from their modeling appropriate behavior." *Id.* at 71. The ALJ's independent review of the video provided by L.'s parents "generally confirmed" the interpretation offered by Fair Lawn—that L. "is unable to engage with her peers"—rather than the opposite conclusion that was offered by an expert hired by L.'s parents.[6] J.A. at 54. Additionally, the ALJ noted that "[t]he evidence that [L.] had any interest in peers came largely from [her mother], and was generally anecdotal." J.A. at 67. The ALJ thus determined that

---

[5] As noted above, the District Court made no factual findings, but it implicitly adopted those made by the ALJ.

[6] The ALJ noted that the expert hired by the parents to testify "was quite evasive on cross-examination and exhibited an unusually strong bias in her testimony" such that the ALJ was "unable to take much stock in her opinion." J.A. at 67. By contrast, Fair Lawn's interpretation was offered by its behaviorist and coordinator for the Stepping Stones program (Diane Ciaramella), who was "much more intimately familiar with [L.'s] abilities and limitations" and "betrayed no bias" such that the ALJ "attached greater weight to [her] testimony." J.A. at 68.

the benefits of a less restrictive environment would not accrue to L. given her limited abilities. The ALJ also found that L. "learns best one-to-one," and that she "made significant and meaningful progress" at Stepping Stones. J.A. at 70. Stepping Stones provided L. with the opportunity to interact with peers who had higher skills than she, and the ABA program used at Stepping Stones provides for mainstreaming when a child has developed the appropriate prerequisite skills. Moreover, L.'s IEPs provided that L. would have "the same opportunities for participation in school social and extracurricular activities as her non-disabled peers," J.A. at 528, and that Fair Lawn would "continue to monitor her progress to ensure she has opportunities to interact with nondisabled peers when she is able to benefit from them." J.A. at 617. The addition of a reverse-inclusion component to the Stepping Stones program also demonstrates Fair Lawn's efforts to provide L. with opportunities to interact with typically developing peers to the maximum extent appropriate. These facts demonstrate that the District Court properly adopted the ALJ's conclusion that Fair Lawn satisfied the least restrictive environment requirement.

## C. Evidence Related to Children's Center

L.'s parents also argue that the District Court erred in upholding the ALJ's exclusion—pursuant to the bifurcation order—of evidence related to the Children's Center and L.'s progress there, and in denying their request to introduce the same evidence in the District Court. Under the New Jersey Administrative Code, a judge has the authority to bifurcate a hearing when, "there are multiple parties, issues or claims, and the nature of the case is such that a hearing of all issues in one proceeding may be complex and confusing, or whenever a substantial saving of time would result from

13

conducting separate hearings or whenever bifurcation might eliminate the need for further hearings." N.J. Admin. Code § 1:1-14.6(e). Furthermore, a judge is permitted to exclude evidence when the risk of it taking an undue amount of time to consider substantially outweighs its probative value. *Id.* § 1:1-15.1(c). Given the length of the hearing and the size of the record in this case, we agree with the District Court that "the ALJ gave each side ample opportunity to present and examine evidence, and that his ruling did not prejudice [Appellants]." *Fair Lawn*, 2011 WL 2559547, at *5.

IDEA provides that the district court "shall hear additional evidence at the request of a party." 20 U.S.C.§ 1415(i)(2)(C)(ii). This court has interpreted the statutory directive to mean that, while a district court may appropriately exclude some evidence, "a court must exercise particularized discretion in its rulings so that it will consider evidence relevant, non-cumulative and useful in determining whether Congress' goal has been reached for the child involved." *Susan N.*, 70 F.3d at 760. Evidence of a child's progress—or lack thereof—in an alternative placement may be relevant to the court's determination whether a school district's IEP was appropriate at the time it was drafted. *See id.* at 762. In this case, however, the District Court accepted as fact L.'s parents' contention that L. was demonstrating significant success at the Children's Center. *See Fair Lawn*, 2011 WL 2559547, at *6. Therefore, the evidence related to the Children's Center and L.'s progress there would have been merely cumulative, and the District Court's decision to exclude this evidence was not an abuse of discretion.

## III.

For the reasons stated above, we will affirm the District Court's decision.