Suzanne **COALE** and Ronald **Coale**, Plaintiffs,

v.

**STATE DEPARTMENT OF EDUCATION and Brandywine School District**, Defendants.

No. C.A. 97–618–GMS.

United States District Court, D. Delaware.

Aug. 30, 2001.

318

Neil R. Lapinski, Esq. Wilmington, DE, for Plaintiffs.

Gretchen S. Knight, Esq. and Mary L. Sutherland, Esq. of Morris, James, Hitchens & Williams LLP, John B. Hindman, Esq. of the State of Delaware Department of Justice, Wilmington, DE, for Defendants.

## MEMORANDUM OPINION

SLEET, District Judge.

### I. INTRODUCTION

Suzanne and Ronald Coale (the "Coales") bring this action against the Brandywine School District and the State Department of Education (collectively the "State"), pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.[1] Under the IDEA, states that receive certain federal funding

---

1. IDEA was amended on June 4, 1997. These amendments made fairly substantial revisions to the information required to be specified in an "individualized education program" (IEP) under the statute. Compare 20 U.S.C. § 1401(a)(20) (pre-amendment), with 20 U.S.C. § 1414(d) (post-amendment). The effective date of the amendments to provisions relating to IEPs was July 1, 1998. See, e.g., Tucker v. Calloway County Bd. of Educ., 136 F.3d 495, 501 n. 18 (6th Cir.1998) (citing effective dates of various IDEA provisions). Because all of the relevant events in this case took place prior to July 1, 1998, the court must apply the applicable IEP provisions as they existed prior to the June 1997 amend-

ments. See Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 86 n. 3 (3d Cir.1999); Patricia P. v. Board of Educ. of Oak Park, 203 F.3d 462, 465 & n. 1 (7th Cir.2000).

Amendments to certain other IDEA provisions took effect immediately, on June 4, 1997. Since some of the events in this case took place after that date, the amended versions of those provisions apply. The only changes that actually bear on the outcome of this case, however, are the amendments to the IEP provisions. Rather than switch back and forth between different versions of the statute, the court will cite to the pre-amendment version of the IDEA throughout this memorandum opinion.

(as does Delaware) are required to provide children with disabilities with a "free appropriate public education" (FAPE). *See id.* at §§ 1400(c), 1401(a)(18), 1415(b)(1)(E) Under the IDEA, the State must provide special educational services that are "reasonably calculated" to provide disabled children with "meaningful" educational benefits. *See Bd. of Educ. v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 180–84 (3d Cir.1988). The services to be provided must be tailored to each child's individualized needs, and must be set forth in a written statement referred to as an "individualized education program" (IEP). *See* 20 U.S.C. § 1401(a)(18), (20); *see also Rowley,* 458 U.S. at 181–82, 102 S.Ct. 3034. The IEP must also set forth goals and objectives, as well as procedures for evaluating whether those objectives are being met. *See* 20 U.S.C. § 1401(a)(20).

The Coales allege that the State failed to meet these statutory obligations with respect to their son, Alex Coale, for the 1997–98 school year. As required by the IDEA, the Coales first asserted their claim before a due process hearing panel ("the Panel"). *See id.* at § 1415(b)(2). In an opinion dated November 6, 1997, the Panel ruled in favor of the State. In this action, the Coales seek judicial review of the Panel's decision, pursuant to § 1415(e)(2).[2]

## II. BACKGROUND AND PROCEDURAL HISTORY

■ At the time of the filing of the latest amended complaint, Alex was 14 years old. He was enrolled in the 8th grade at the Hanby Middle School in the Brandywine School District. As noted above, however, the present dispute relates to the IEP proposed by the State for the 1997–98 school year.[3] In that year, Alex was a 6th grade student at Burnett Elementary School, also in the Brandywine School District.

The State does not dispute that Alex is "learning disabled" and that he qualifies for specialized treatment under the IDEA. While the parties have used various terms to describe Alex's disability, his problems are generally related to written and spoken language skills. In addition to causing difficulty in such areas as reading comprehension, written and verbal expressive skills and spelling, Alex's disability also impairs certain "motor" skills—i.e., the "physical" aspects of writing.

Alex has received special educational services under the IDEA since 1989. At that time, he entered a developmental preschool program in the Brandywine School District. As contemplated by the statute, the Coales have actively participated in the development of all of Alex's IEPs. Initially, Alex received all of his educational services in special education classrooms. In 1992, Alex began integrating into regular education classrooms. He continued to receive instruction in language related subjects in a special education "resource room," but all other academics were provided to Alex in the "mainstream" class-

---

**2.** In their original complaint and their first two amended complaints, the Coales asserted a variety of federal and state claims in addition to their IDEA claim. A jury trial had been demanded, and was scheduled for February 14, 2000. On October 1, 1999, the Coales filed a third amended complaint eliminating all but their IDEA claim.

**3.** It is well established that the passage of the school year at issue does not moot an IDEA lawsuit. Due to the inevitable delays in litigation, a contrary rule would make the IDEA largely unenforceable. Thus, jurisdiction is deemed proper pursuant to the "capable of repetition yet evading review" exception to the mootness doctrine. *See Rowley,* 458 U.S. at 186 n. 9, 102 S.Ct. 3034.

room with nondisabled students. This type of placement continued through Alex's 1996–97 school year. Alex's IEPs for 1995–96 and 1996–97 also included twice weekly speech and language therapy sessions, and occupational therapy once a month. In January, 1996, Alex began receiving one-on-one tutoring in reading and spelling. In June, 1996, the State also agreed to provide Alex with certain assistive technology to help compensate for his disability. This technology included an Alpha Smart ProWriting device, a Franklin Spell Checking device, and two types of word processing software.

For some time, the Coales had become increasingly convinced that Alex was not making adequate academic progress, particularly with respect to his writing skills. In November, 1996, the State arranged for a comprehensive speech and language evaluation to be performed at the Alfred I. duPont Institute (the "Institute"). The evaluation was conducted by Nina Straitman, a speech pathologist at the Institute. Straitman first observed Alex in the classroom setting and then administered a series of tests at the Institute. Alex's test scores revealed a wide range of ability in various component subskills of oral and written language. His efforts at written expression were particularly weak.

The results of Straitman's evaluation, as well as other testing that had been administered by school district personnel, were discussed with the Coales at an IEP team meeting on January 23, 1997. Straitman recommended that the State shift its focus in developing Alex's writing skills. Rather than focusing on spelling, punctuation, and capitalization, she recommended first concentrating on organization and content at the sentence and paragraph level.

At Straitman's suggestion, the State agreed to implement an eight week "writing intervention" for Alex. The intervention was designed with Straitman's input. It was implemented during February and March, 1997 by Alex's regular education teacher (Jennifer Million), special education teacher (Kelly Ryan) and speech/language therapist (Susan Townsend). The intervention involved daily work aimed at creating written journal entries. In accordance with Straitman's recommendation, the focus was on organization and content rather than spelling and punctuation. Straitman's testimony at the due process hearing established that Alex made significant improvements in the targeted areas during this intervention.

The IEP team began work on Alex's 1997–98 IEP at a meeting on March 27, 1997. The meeting was attended by, *inter alia*, the Coales, Straitman, Alex's teachers and tutor and school administrators. The writing intervention was discussed, as was Alex's progress in his classes and tutoring sessions. The Coales expressed concerns that Alex had not made adequate progress despite the extensive efforts that had been made on his behalf. Draft goals and objectives were developed for Alex's 1997–98 proposed IEP, incorporating elements of the writing intervention. Dr. Cheryl Morton, the school principal, recommended placing Alex in an "integrated classroom" at Burnett for the 1997–98 school year. In that setting, Alex would be taught all subject areas in a classroom that included both disabled and nondisabled students. A regular education teacher and a special education teacher would be present in the classroom at all times. Alex's reading tutor, Tona Huiner, suggested that by expanding her tutoring sessions from one hour per day to one and a half hours per day, she could incorporate a writing program in addition to the reading programs she had been using. The team also discussed eight weeks of extended school year services for Alex during the

summer of 1997. Marilyn Arons, the Coales' nonattorney advocate, raised the issue of the need for an independent evaluator, now that Straitman was "working collaboratively with the district."

The next IEP meeting was scheduled for June 6, 1997. That meeting was canceled by the Coales for personal reasons. A friend of Mrs. Coale, Anita Watson, telephoned Joseph Price, a Burnett school administrator, regarding the rescheduling of the meeting. On behalf of the Coales, Watson requested that the IEP meeting not be rescheduled until after Alex had been tested by Dr. Gail Liss, a school psychologist/speech and language pathologist retained by the Coales. To ensure that Alex's progress was discussed and documented before his teachers left work for the summer, Price convened a "multidisciplinary team" meeting on June 10, 1997. Straitman had retested Alex on May 30, 1997, and presented the results at this meeting. Other test results and a May 30, 1997 writing sample from Alex were also discussed.

Dr. Liss evaluated Alex on July 23 and 24, 1997. She administered a variety of tests, and also reviewed a large volume of Alex's scholastic records. Alex scored lower on some of Dr. Liss' tests than he had on comparable tests that had previously been administered. His lowest scores came on a particular written language test that had not previously been administered. Dr. Liss concluded that Alex had made only minimal progress despite extensive efforts that had been undertaken by the State over many years.

On July 15, 1997, the Coales wrote to Price requesting an IEP meeting on July 31, 1997. Price indicated that he could not assure that all of the necessary IEP team members would be available at that time. He did, however, offer to meet with the Coales to discuss Alex's proposed IEP and the results of the Dr. Liss' evaluation. The meeting took place on July 31. Among the attendees were Price, Morton, the Coales and Arons. The Coales were given a copy of a draft IEP for 1997–98, which Price thought had previously been provided to them. The proposed program and "integrated classroom" placement were discussed. In an August 6, 1997 letter to the Coales, Price summarized the discussions at the July 31 meeting and noted that a formal IEP meeting would need to be convened in early September to finalize Alex's 1997–98 IEP.

By letter dated August 7, 1997, the Coales requested a due process hearing pursuant to 20 U.S.C. § 1415(b). In that letter, they claimed that the school had not met its responsibility to have an IEP in place for the 1997–98 school year. They also noted that despite three years of working with the State to address Alex's needs, he had still shown no growth in written language skills. The Coales requested placement at the Greenwood School, a 24 hour residential program in Vermont. On August 19, 1997, the Coales wrote to Price, invoking the IDEA's "stay-put" provision. *See* § 20 U.S.C. 1415(e)(3). That request prevented the State from implementing any proposed change in placement during the pendency of the due process proceedings.

Since a final IEP had not yet been adopted, Price invited the Coales to an IEP meeting on September 12, 1997. Price was aware that the Coales had invoked the stay-put provision, but he indicated to the Coales that the State was nevertheless required by statute to hold a meeting to formally adopt a proposed IEP. By letter dated September 2, 1997, the Coales declined to attend the September 12 meeting. They indicated their disapproval of the proposed integrated classroom placement and suggested that Price

called the meeting only because of the due process hearing scheduled for later that month. The IEP team met without the Coales. The team agreed to adopt the proposed 1997–98 IEP that had been presented to the Coales at the July 31 meeting. Though the record is somewhat unclear, it appears that the only change to the proposed IEP that was made at the September 12 meeting was to add a list of "classroom accommodations"—i.e., a list of ways in which Alex's teachers were to accommodate his disabilities.

In testimony at the due process hearing and written closing arguments submitted to the Panel, the State described the proposed 1997–98 IEP as including the following features:

1. Placement in an integrated classroom for all subjects. The classroom would include disabled and nondisabled students (approximately 30 students in total). A regular education teacher and a special education teacher would both be present at all times.

2. One-on-one tutoring by Huiner for one and a half hours per day, four days per week, covering reading, spelling and written expression.

3. A one hour session the remaining day of each week to provide reading practice for fluency.

4. Speech and language therapy in two thirty minute sessions per week.

5. Continued consultation by Straitman to implement the written expression intervention in the integrated classroom with the regular and special education teachers and the speech/language therapist.

6. Extended school year services consisting of one-on-one tutoring in four one hour sessions per week, for five weeks during the summer.

After a three day hearing, the Panel issued its opinion on November 6, 1997. The Panel ruled in favor of the State, concluding that the proposed IEP as just described was reasonably calculated to provide Alex with meaningful educational benefits. The Panel also concluded that the State had not violated the procedural requirements of the IDEA by holding the June 10, 1997 meeting without the presence of the Coales, nor by failing to adopt a proposed 1997–98 IEP until September 12, 1997.

On November 24, 1997, the Coales filed a complaint in this court seeking judicial review of the Panel's November, 1997 decision pursuant to 20 U.S.C. § 1415(e)(2). That provision reads as follows:

Any party aggrieved by the findings and decision made [by the due process hearing panel] shall have the right to bring a civil action with respect to the complaint presented pursuant to this section .... In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

*Id.* at § 1415(e)(2).

On October 8, 1999, both parties moved for summary judgment. After reviewing the parties' briefs, the court held a teleconference on January 19, 2000. The parties indicated that they no longer wanted a trial or evidentiary hearing.[4] Rather, they

4. As previously noted, earlier versions of the complaint raised a variety of federal and state law claims, and a jury trial had been request-

ed on the non-IDEA claims. These claims, however, are not presently before the court. *See* note 2, *supra.*

asked the court to decide the case based on the administrative record developed at the due process hearing, the summary judgment briefs, and oral arguments. Because neither party wished to present additional evidence beyond that which has already been submitted (the administrative record and the attachments to the summary judgment briefs), there is no reason to apply the typical summary judgment standard. For example, to the extent the court finds that there are "genuine issues of material fact," the court will simply decide those issues of fact based on a preponderance of the evidence standard of proof. *Cf. Patricia P.* 203 F.3d at 464 (noting that where no additional evidence is to be received, "the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record .... Accordingly, despite being termed summary judgment, the district court's decision is based on the preponderance of the evidence.") (citations omitted).[5]

Subsequent to the submission of the briefs and oral argument, the court held an unsuccessful settlement conference with the parties on May 31, 2000. The parties, however, indicated that they wished to pursue settlement discussions among themselves. As of March, 2001 the court had not heard from the parties regarding settlement.[6] As a result, the court requested the parties advise it of the status of the case (D.I.85). The court also denied the pending motions for summary judgment without prejudice (D.I.86). The parties submitted a joint status report on March 23, 2001 which stated that settlement negotiations had broken off

and stated their intent renew the motions for summary judgment (D.I.87). After a scheduling conference on April 19, 2001, the court renewed the motions. The court also entered a new schedule on May 10, 2001 (D.I.91).

## III.  DISCUSSION

### A.  The Nature of Judicial Review under The IDEA

In conducting its review, the court must consider whether the State has met both the "procedural" and "substantive" requirements of the IDEA. As the Supreme Court has explained:

> [A] court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the [IEP] developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?

*Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The "procedural" prong of this test includes an inquiry into whether the IEP in question conforms with the requirements specified in § 1401(a)(20). *See id.* at 206 n. 27, 102 S.Ct. 3034.

Although the court is to conduct an "independent" review of the administrative record, *Oberti v. Board of Educ.,* 995 F.2d 1204, 1219 (3d Cir.1993), it is not "free to substitute [its] own notions of sound education policy for those of the educational agencies [it] review[s]." *Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751, 757 (3d Cir. 1995) (citing *Rowley,* 458 U.S. at 205–06, 102 S.Ct. 3034). Rather, the court must

---

**5.** At the outset of oral arguments held February 16, 2000, the court confirmed that the parties intended for the court to decide the case on the evidence already submitted, rather than to determine if there were genuine issues of material facts.

**6.** The court held a status conference with the parties on July 6, 2001, and the parties were to advise the court of the next IEP meeting.

give "due weight" to the findings of the due process hearing panel. *See id.* The Third Circuit has not spoken definitively on the meaning of "due weight." *See id.* It has, however, noted that district courts have discretion to determine the amount of deference to be afforded a panel's findings. *See Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 527 (3d Cir.1995). The court must consider the panel's factual findings, but it need not accept them. *See id.* at 529.

■ The State has the burden of proving that it has satisfied its obligations under the IDEA. *See Carlisle,* 62 F.3d at 533; *Oberti,* 995 F.2d at 1219–20. In the Third Circuit—contrary to the rule in most circuits—the State retains this burden of proof in the district court even when it was the successful party at the due process hearing.[7] *Compare Oberti,* 995 F.2d at 1219–20, *with Patricia P.,* 203 F.3d at 466–67 (placing burden of proof on student, as party challenging outcome of state administrative hearing); *Clyde K. v. Puyallup*

*Sch. Dist.,* 35 F.3d 1396, 1399 (9th Cir. 1994) (joining "the substantial majority of the circuits" that place burden of proof on party challenging administrative ruling).

### B. The Substantive Requirement of The IDEA [8]

#### 1. The Substantive Standard to Be Applied

■ To satisfy the IDEA's substantive requirement, the State's proposed program must be reasonably calculated to provide meaningful educational benefit. *See Ridgewood Bd. of Educ.,* 172 F.3d at 247–48. While no bright line rule has been articulated to determine how much of a benefit is "meaningful," it is not enough to merely find that the State has provided for "more than a trivial educational benefit." *See id.* at 247. Further, although the State's program need not be designed to maximize the potential of a disabled student, the court must consider the potential

---

7. Although the court in *Oberti* was only addressing the burden of proof as to the IDEA's "mainstreaming" requirement (i.e., the requirement that, "to the maximum extent appropriate," children with disabilities are educated along with nondisabled children), its analysis does not suggest any reason to limit this rule to that aspect of a FAPE. *See Oberti,* 995 F.2d at 1218–20; *see also Carlisle,* 62 F.3d at 533 ("In administrative and judicial proceedings, the school district bears the burden of proving the appropriateness of the IEP it has proposed.").

When a student seeks reimbursement for private school tuition, however, it appears that the student may bear at least part of the burden of proof. In *Ridgewood Bd. of Educ. v. N.E.,* the court noted that parents are entitled to such an award if: "(1) the court determines the student's IEP is inappropriate and (2) the *student* demonstrates that the private placement he seeks is proper." 172 F.3d 238, 248 (3d Cir.1999) (emphasis added). As indicated by this test, however, the court need only reach the question of the propriety of the private placement if it first finds that the State's proposed placement is inappropriate.

8. A court's analysis under the IDEA should ordinarily begin with a determination as to whether the IDEA's procedural requirements have been met. *Cf. Rowley,* 458 U.S. at 206, 102 S.Ct. 3034. Indeed, the Supreme Court has noted that the IDEA's emphasis on procedural requirements "demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *See id.*

Nevertheless, initially, the court will discuss the substantive requirement. The reasons for this are several. First, as noted *infra,* the Coales have abandoned the two procedural challenges that the Panel addressed in its decision. Second, the focus of the parties' dispute—both at the administrative hearing and on appeal to this court—was on the IDEA's substantive requirement. Finally, the procedural objections now advanced by the Coales are placed in better context after a discussion of the evidence relating to the substantive standard.

of the particular student before it. *See id.* at 247–48. Thus, for example, "[w]hen students display considerable intellectual potential, [the] IDEA requires a great deal more than a negligible benefit." *Id.* at 247 (citation and internal quotation marks omitted).

### a. The IDEA Does Not Require The State to Provide Alex with an Educational Opportunity That Is "Substantially Equal to That of His Classmates"

■ Contrary to the Coales' assertion, the Third Circuit has not "embraced" the standard advanced by Justice Blackmun in his concurrence in *Rowley.* The Coales suggest that to determine whether Alex's IEP was reasonably calculated to provide "meaningful" educational benefit, the court should ask: "Did Alex's proposed IEP provide him the opportunity substantially equal to that of his classmates to understand and, more importantly, participate in a regular classroom?" *See* Pl. Op. Br. Sum. J. at 11. The majority opinion in *Rowley* explicitly rejected the proposition that the IDEA imposes such an "equality" requirement. *See Rowley,* 458 U.S. at 198, 102 S.Ct. 3034. The Third Circuit is, therefore, not free to "embrace" Justice Blackmun's concurring opinion, and the Coales have cited no case law suggesting it has done so.

### b. Delaware Does Not Impose a Higher Substantive Standard

■ The Coales next contend that Delaware imposes a higher substantive standard than that mandated by the federal statute standing alone. It is true that the IDEA incorporates state standards within the definition of a FAPE and that a school district violates the IDEA by failing to meet more stringent standards imposed by state law. *See* 20 U.S.C. § 1401(a)(18)(B); *Michael C. v. Radnor Twp. Sch. Dist.,* 202 F.3d 642, 652–53 (3d Cir.2000). The court does not agree, however, that Delaware imposes a higher substantive standard of educational benefit than that imposed by the IDEA itself.

The Coales argue that a higher standard is evident from a definition in an administrative manual published by the Delaware State Board of Education. *See* Admin. Manual: Programs for Exceptional Children (1996) ("the Manual"). In language that tracks federal regulations, the Manual notes that public agencies must ensure that a "continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services." *See* Manual at 41 (citing 34 C.F.R. § 300.551). The Manual defines "continuum of alternative program placements" as those placement programs, ranging from regular classrooms to residential schools or treatment centers, that provide for education of each student "in an alternative *best suited* to the child's need." *See id.* at 140 (emphasis added).

Based on this language, the Coales contend that the proper inquiry is not whether the State's proposed placement at Burnett is reasonably calculated to provide meaningful educational benefit. Instead, they argue that the proper inquiry is which placement—the State's proposed placement at Burnett or the Coales' requested private residential placement at Greenwood—would be more beneficial to Alex. This inquiry, however, would ignore the "mainstreaming" requirement imposed by both the IDEA and Delaware law. *See* 20 U.S.C. § 1412(5)(B);[9] 14 Del. C. § 3124(a).

---

9. To receive federal funding, states must demonstrate that they have established proce-

The court concludes that in seeking to ensure the availability of placement alternatives "best suited" to children's needs, the Manual merely requires the State Board of Education to meet its mainstreaming obligation under the IDEA. Said another way, the placement that is "best suited" to a disabled student is the one that is reasonably calculated to provide meaningful educational benefits in the least restrictive environment. *Cf. Carlisle,* 62 F.3d at 535 (noting that district court would have erred if it ordered the allegedly "better" residential placement requested by student's parents, since doing so would have violated The IDEA's mainstreaming requirement).[10]

### 2. The Proposed IEP to Which The Standard Should Be Applied

■ The proper inquiry under the IDEA is not whether a particular program did, *in fact,* provide a meaningful edu-

cational benefit. Rather, the question is whether the State's proposed IEP was, *at the time it was proposed,* reasonably calculated to provide such benefit. *See Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034; *Susan N.,* 70 F.3d at 762; *Carlisle,* 62 F.3d at 530, 534.

This case presents a somewhat unusual threshold dispute—exactly what is the relevant State proposal, and at what point in time should that proposal be evaluated for reasonableness? This question arises because the State's proposed IEP for the 1997–98 school year was developed over a period of time. It was not formally adopted by the State until after the Coales filed their request for a due process hearing.

As previously noted, the development of Alex's 1997–98 IEP began at an IEP team meeting on March 27, 1997. Although the document that both parties refer to as the

---

dures "to assure that, to the maximum extent appropriate, children with disabilities are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *See* 20 U.S.C. § 1412(5)(B). This is sometimes referred to as the IDEA's "mainstreaming" requirement. *See Oberti,* 995 F.2d at 1206–07. It is also said to require states to educate disabled children in the "least restrictive environment." *See* 34 C.F.R. § 300.550; *Carlisle,* 62 F.3d at 535; *see also* Manual at 40 ("Least Restrictive Environment is operationalized in terms of the degree of interaction between students with and without disabilities.").

**10.** The Coales contend that in concluding that the State's proposed IEP met the IDEA's least restrictive environment requirement, the Panel overlooked the potential harmful effect of placement in a regular classroom. They note that Dr. Liss recommended that Alex should

avoid public humiliation. They then assert: "[n]owhere is this more of a threat than in the traditional classroom setting." *See* Pl. Op. Br. Sum. J. at 12. They contend that humiliation and embarrassment "can be avoided in a private residential placement, in a homogeneous environment such as the Greenwood School." Tr. 2/16/00 at 65. Since all disabled students would presumably benefit from avoiding public humiliation, the Coales' assumption that traditional classrooms present undue risk of such humiliation is little more than a rejection of the "strong Congressional preference for integrating children with disabilities in regular classrooms." *Oberti,* 995 F.2d at 1213–14 (citations omitted).

The court has reviewed the record from the due process hearing and has found no evidence that Alex has experienced public humiliation in his regular education classes at Burnett, and no evidence that he would be likely to experience such humiliation in the integrated classroom proposed by the State. To the contrary, Alex's regular education teacher for the 1996–97 school year testified that Alex gets along "wonderfully" with his classmates. She added that he was "like a role model" and that he was "always a super citizen."

1997–98 IEP is dated March 27, 1997, *see* Ex. SD–3,[11] it is clear that parts of that document were either added or revised subsequent to that date. The IEP was to be further developed (if not formally adopted) at an IEP meeting scheduled for June 6, 1997. The meeting, however, was canceled at the Coales' request. The draft IEP was apparently revised at a meeting held June 10, 1997. A revised draft was presented to the Coales at a meeting on July 31, 1997. *See* Tr. 10/14/97 at 286. Neither of these meetings qualified as IEP team meetings. By letter dated August 7, 1997, the Coales requested a due process hearing. The State formally adopted a proposed 1997–98 IEP at an IEP team meeting on September 12, 1997, which the Coales chose not to attend. As previously noted, it appears that the only change to the proposed IEP made at the September 12 meeting was to add a list of classroom accommodations. Despite these various revisions, the record contains no version of a proposed 1997–98 IEP—draft or final— with a date other than March 27, 1997.

The State contends that in evaluating the proposed 1997–98 IEP, the court should consider the proposed IEP as it stood at the time of the due process hearing, which began on September 23, 1997. The Coales argue that the court should evaluate the IEP as it stood on March 27, 1997, the date of the last official IEP meet-

ing prior to the Coales' due process hearing request. *See* Tr. 2/16/00 at 36. This would not be an easy task since it is unclear what portions of the draft IEP dated March 27, 1997 were actually in existence on that date. Fortunately, the court need not pursue that inquiry because it concludes that March 27 is not the relevant time at which the proposed IEP should be evaluated.

Because it was the Coales that needed to postpone the June 6 IEP meeting, and because the Coales requested that the meeting not be rescheduled until July 31, it would be unfair to evaluate the State's proposed IEP based solely on the portions that were drafted at the very start of the process, on March 27, 1997.[12] Further, as previously noted, the Panel rejected the Coales' assertions that the June 10 meeting was improper and that the State's formal adoption of the proposed IEP on September 12 was untimely under the IDEA. The Coales have abandoned those alleged procedural violations in their appeal to this court. As such, the court concludes that the proper inquiry is whether the proposed IEP adopted by the State on September 12, 1997 was, at that time, reasonably calculated to provide Alex with meaningful educational benefits.[13] The primary features of the State's proposed program and placement are listed in Section II, *supra*.[14]

---

**11.** The State's exhibits at the due process hearing were identified as "SD-___," and the Coales' exhibits were identified as "P-___." These designations will also be utilized in this memorandum opinion.

**12.** The court does not mean to suggest that the Coales did anything improper. They needed to postpone the June 6th meeting due to a personal tragedy, and reasonably suggested that the meeting not be rescheduled until the results of Dr. Liss' evaluation of Alex were available.

**13.** It should be noted that, despite the various dates and meetings referred to above, the

proposed IEP as adopted on September 12 does not appear to be substantially different from the recommendations discussed at the March 27 meeting. *Compare* Ex. SD–3 (proposed IEP dated March 27, 1997 but adopted September 12, 1997), *with* Ex. SD–16 (minutes of March 27 IEP team meeting).

**14.** These features are consistent with the Panel's description of the proposed IEP to be evaluated. The Panel opinion does not address the issue of which version of the 1997–98 IEP was the proper subject of its review. The parties did not raise that issue either to the Panel or to this court. Rather, the court

### 3. Application of The Substantive Standard

■ The court finds that the State has met its burden of proving that its proposed IEP for Alex's 1997–98 school year was reasonably calculated to provide him with meaningful educational benefit. The State introduced ample evidence—in the form of objective test results and subjective evaluations from Alex's teachers, tutors, and school administrators—indicating that Alex was making significant progress in various areas including math, reading, and more recently, writing. The State also introduced expert witness testimony from Straitman, a clinical specialist in speech and language pathology. Straitman has been employed for 19 years at the Alfred I. duPont Hospital for Children. Straitman's May 30, 1997 report showed significant improvement on objective tests she administered in November 1996 and May 1997. *See* Ex. SD–1. Although Alex's writing skills remained severely depressed in terms of percentile ranking and age equivalence, his written expression score demonstrated a two year increase in age equivalence in the six months between these two testings. Straitman also testified as to the substantial improvement noted in writing samples Alex produced at the beginning and end of the eight week writing intervention implemented in February and March, 1997.

Substantial progress in Alex's reading skills was also reported by Huiner, Alex's reading tutor. Huiner had supervised Alex's previous tutor from January to May, 1996. She tutored Alex herself in the summer of 1996 and throughout the 1996–97 school year. She testified to substantial increases Alex achieved on standardized tests given in January, 1996, October, 1996, and May, 1997.[15] She also testified as to the progress she observed in Alex's daily tutoring sessions. Progress was also reported by Ryan and Million, Alex's special education and regular education teachers during the 1996–97 school year.

More important to the present inquiry, however, there was ample evidence to establish that Alex could reasonably be expected to continue making meaningful progress under the proposed 1997–98 IEP. Virtually all of the witnesses—including the Coales' expert, Dr. Liss—agreed that language is a "developmental" skill, and that written expression is one of the last and hardest skills to develop. Straitman also testified that it was necessary for Alex to develop his oral expression skills before tackling written expression skills. Based on the substantial improvement in oral expression skills that Alex had demonstrated in her May, 1997 evaluation, Straitman testified that she believed Alex was ready to make progress in the written expression area.

Dr. Morton, the principal at Burnett, testified about the benefits of the integrated classroom the State proposed for Alex's 1997–98 school year. Unlike the previous year, when Alex received language related subjects in a special education resource room and other subjects in a regular classroom, Alex would receive all of his classes in an integrated classroom under the pro-

raised this issue *sua sponte,* since, as noted above, the only document purporting to be the proposed IEP was dated March 27, 1997, yet the administrative record clearly referred to revisions subsequent to that date.

**15.** Huiner's May 1997 test scores may be misleading because, unbeknownst to her, some of those tests had been administered by Straitman on the previous day. This does not undermine the growth noted on Huiner's tests from January to October, 1996, nor on Straitman's tests from November, 1996 to May, 1997.

posed IEP for 1997–98. This approach is consistent with the need for continuity across subject areas that was noted by both Straitman and Dr. Liss. The classroom would include both disabled and non-disabled students, and both a regular education and special education teacher would be present at all times. Dr. Morton testified that the two teachers that would be in Alex's class both had particular expertise in writing instruction, Alex's weakest area.

The proposed 1997–98 IEP also anticipated expanding Huiner's one-on-one tutoring sessions from four 1 hour sessions per week to four one and a half hour sessions per week. This would enable her to provide tutoring in writing, in addition to the reading and spelling tutoring that would continue under the proposed IEP. Further, the State had arranged for Straitman to recommend modifications to the prior year's writing intervention program in response to Alex's 1997–98 curriculum and classroom setting.

The Coales' primary witnesses were Dr. Liss and Suzanne Coale, Alex's mother. Dr. Liss was offered and accepted as an expert in the area of language and learning disabilities with a specialty in written language. She evaluated Alex on July 23 and 24, 1997. As part of that evaluation, Dr. Liss had administered a variety of tests and reviewed a large volume of Alex's scholastic records. She concluded that Alex appears to have a "profound learning disability" that has had a serious impact on a wide variety of language relat-ed areas, including reading, oral and written expression, the mechanics of writing and auditory and visual memory. She believed that Alex had made only minimal progress despite the extensive efforts and resources that the State had expended on his behalf over many years.

Dr. Liss acknowledged, however, that Alex's performance on her tests may have been affected by the fact that they were administered in late July, when he was not in the daily routine of a regular school day. She also noted that it would be expected for a child with learning disabilities to show some regression when tested after he had been out of school for some time.[16]

With respect to Alex's proposed placement for the 1997–98 school year, Dr. Liss testified that she did not believe Alex's needs could be met in any "regular education setting." When asked to explain, she stated:

> I think there has been a significant amount already tried for this young man and there has been so little growth, I think he really needs to be in an environment that is small, structured, [with] teachers [who] have a true understanding and lots of experience with children with language based learning problems, that there's continuity from subject to subject in the teaching approach, that there's a great deal of individualization. So that's why I think that it's difficult to do that in a regular classroom.

---

**16.** Dr. Liss stated that extended school year services should be provided to stem such regression. The State had, however, offered such services in the form of one-on-one tutoring sessions four times per week for five weeks. Alex received only eight of these sessions during the summer of 1997, apparently as a result of some scheduling problems and the Coales' concern that Alex should not be driven too hard over the summer. The court does not mean to suggest that the Coales' concern was unwarranted, or that either party was to blame for the limited summer tutoring that actually occurred. But as noted above, Alex's performance on Dr. Liss' tests may have been affected by regression over the summer. And, contrary to Liss' suggestion, that possibility should not be disregarded on the grounds that the State failed to stem that regression with more aggressive extended school year services.

On cross-examination, however, Dr. Liss acknowledged that she was not aware of the State's proposed IEP for 1997–98. When the program was described to her, she noted that it sounded good, but that she "would have to see exactly how it was going to be implemented and by whom and what would their experience be and who the other children were who were going to be involved in the program." She also acknowledged that she was not aware that the writing intervention coordinated by Straitman had deliberately focused on content at the sentence and paragraph level, rather than on spelling, punctuation and writing mechanics.

Furthermore, while Dr. Liss testified that the residential private placement requested by the Coales would be a "good placement" and would be "helpful at this point," her testimony evinces a misunderstanding of the IDEA's "mainstreaming" requirement. When asked what the term "least restrictive environment" meant to her, she replied:

> It's a place where the IEP can be implemented, where the child can become self-sufficient and independent, where there's no potentially harmful effect and Alex is a boy who has the intellectual potential to go on to higher education, to college, but if the gap continues to widen and even if it closes a little bit, ... the gap is still so far between his performance and his potential, that I'm concerned about his future.

The court does not take issue with Dr. Liss' concerns as an educator. But this response does not describe what is meant by the term "least restrictive environment." *See* 20 U.S.C. § 1412(5)(B); 34 C.F.R. § 300.550; *Carlisle*, 62 F.3d at 535; *see also* Manual at 40 ("Least Restrictive Environment is operationalized in terms of the degree of interaction between students with and without disabilities.").

Like Dr. Liss, Mrs. Coale also testified that she did not believe Alex had made adequate progress, particularly in his writing skills, despite the extensive efforts that had been made on his behalf. Much of her opinion, however, was based on informal writing samples that Alex had produced outside of the classroom setting—e.g., telephone messages and informal notes. When shown an impressive writing sample Alex had produced at school on May 30, 1997, Mrs. Coale testified that Alex does not produce that quality of writing at home. Also like Dr. Liss, Mrs. Coale focused more on the lack of progress from prior years' efforts than on specific inadequacies of the proposed 1997–98 IEP. She testified that she viewed the writing intervention coordinated by Straitman as largely a continuation of the same things that had been attempted in prior years.

The Coales' "more of the same" argument fails for two reasons. First, as noted above, the court concludes that as of September 12, 1997, Alex had made significant progress in reading and oral expression, and was beginning to make significant progress in written expression. Second, the court concludes that the proposed 1997–98 IEP was not simply "more of the same." *Cf. Carlisle*, 62 F.3d at 534 (rejecting "more of the same" challenge to proposed IEP)

Alex's placement in an integrated classroom with a special education and regular education teacher present at all times should help provide the continuity across subject areas that Dr. Liss recommended. The proposed shift in focus from spelling and punctuation to organization and content was not an insignificant change in approach to developing Alex's writing skills. This change was a reasonable shift in priorities in light of the availability of

assistive technology to help with spelling and writing "mechanics."[17] The proposed expansion of Huiner's tutoring sessions to include a writing program should also help Alex develop his writing skills. The "developmental" nature of language suggests that, having made substantial progress in reading and oral expression, Alex could be expected to make meaningful progress in written expression as well.

17. The Coales point out that Dr. Liss was the only witness with expertise in the motor component of writing disabilities. Straitman conceded that she lacked such expertise, but noted that it may be more appropriate to address Alex's motor problems with adaptive technology. There was no evidence that Alex's problems with "fine motor skills" prevented him from effectively using his computer keyboard.

If the IDEA required the State to "cure" Alex's disability, or to produce "meaningful" progress in each and every weakness demonstrated by a student, then the State's decision to accommodate Alex's "fine motor skills" problems with adaptive technology might be more problematic. But the court does not understand the IDEA to impose such requirements on the State.

18. The court finds that considerable weight is "due." *See Susan N.*, 70 F.3d at 757. The hearing transcripts reveal that the Panel members actively questioned the witnesses, made appropriate rulings on evidentiary objections, and have greater expertise than the court has in the area of special education.

19. The court would reach this conclusion based solely on the evidence presented to the Panel, as summarized above. The court takes comfort, however, from certain additional evidence offered by the State that appears to indicate that Alex did, in fact, continue to make substantial progress during the 1997–98 school year. The State asks the court to take "judicial notice" of the conclusion reached by a subsequent due process hearing panel in the course of evaluating the propriety of Alex's 1998–99 IEP. Since that decision has not been appealed to the court (or any other court), it would inappropriate to attach any weight to that panel's "conclusions" with respect to the 1997–98 IEP.

In the course of its decision, however, the panel cites scores from three reading tests

In sum, the State's evidence was not overwhelming. Alex's writing skills are still severely depressed and not every test administered in every subject area demonstrated substantial improvement. But, giving "due weight" to the findings of the Panel,[18] the court concludes that the proposed 1997–98 IEP is reasonably calculated to provide Alex with meaningful educational benefit.[19]

that Dr. Liss administered to Alex in May, 1998. These scores indicate rather dramatic improvements over Alex's scores in the same three tests given by Dr. Liss in July, 1997. *See* Def. Op. Br. Sum. J., App. at A–325. The decision does not cite any scores on writing tests, but notes that Straitman testified that Alex had demonstrated "statistically significant improvements in the area of spelling" and that "the written expression program was effective in moving in the right direction." *Id.*

Contrary to the Coales' assertion, the court believes that it can properly consider this subsequent progress for the limited purpose of assessing whether the 1997–98 IEP was, at the time it was proposed, reasonably calculated to provide meaningful educational benefit. *See* 20 U.S.C. § 1415(e)(2) (court shall hear additional evidence at the request of a party); *Susan N*, 70 F.3d at 762 (stating that after-acquired evidence may be considered only for purpose of assessing reasonableness of school district's decision at time it was made); *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir.1993) ("[E]vidence of a student's later educational progress may only be considered in determining whether the original IEP was reasonably calculated to afford some educational benefit."); *see also* Fed.R.Evid. 803(8) (public reports exception to the hearsay rule).

Such evidence, however, should not carry substantial weight in the manner in which it was presented. The court would rather have received Dr. Liss' full report, rather than three test scores excerpted therefrom. The above-quoted snippets of Straitman's testimony may or not capture the essence of her comments and do not indicate the time frame over which the improvement she speaks of occurred.

As indicated above, the court would conclude that the proposed 1997–98 IEP meets

## C. Alleged Violations of The IDEA's Procedural Requirements

As noted above, the Panel also concluded that the State had not violated the IDEA's procedural requirements by holding a meeting without the Coales on June 10, 1997, nor by failing to adopt a proposed 1997–98 IEP until September 12, 1997. The Coales have abandoned those alleged violations in this appeal. They do contend, however, that the State has failed to create a written IEP that conforms with the requirements of 20 U.S.C. § 1401(a)(20).[20] *See Rowley*, 458 U.S. at 206 n. 27, 102 S.Ct. 3034 (noting that court's procedural inquiry includes determination of whether State has met those requirements).

Specifically, the Coales contend that the State's proposed IEP is inadequate because: (1) it does not contain statements of Alex's present level of educational performance, (2) it states annual goals that are wholly generic, (3) without specific annual goals, short term instructional objectives cannot fulfill their intended purpose, (4) the objective criteria for evaluations are too subjective and impossible to interpret, (5) it does not explain how the assistive technology provided Alex is to be used by and with Alex to achieve his goals and (6)

it failed to document the proposed continuing consultation to be provided by Nina Straitman. As such, they allege that Alex's IEP is almost entirely procedurally defective and results in the denial of a FAPE.

The State contends that the Coales should be precluded from raising these alleged procedural violations on appeal to the court because they failed to assert them at the due process hearing. It also contends that the alleged shortcomings in the IEP are not so significant as to constitute the denial of a free appropriate public education.

### 1. The Coales Adequately Raised These Allegations At The Due Process Hearing

■ Rules of exhaustion and issue preservation apply to judicial review of IDEA due process hearings. *See, e.g., Neshaminy Sch. Dist. v. Karla B.*, 1997 WL 563421, at *5 (E.D.Pa.1997) (citations omitted); *Drinker v. Colonial Sch. Dist.*, 888 F.Supp. 674, 679 (E.D.Pa.1995) (citations omitted). Although the Panel's opinion does not address the alleged procedural violations noted above, the court concludes that these issues were adequately raised at the due process hearing.

---

the IDEA's substantive standard even if this evidence of subsequent progress were disregarded completely. The court need not decide, therefore, whether this evidence could properly be considered.

20. At the time relevant to this case, *see* note 1, *supra*, the IDEA required the State to create a written document for each disabled child that included:

(A) a statement of the present levels of educational performance of such child,

(B) a statement of annual goals, including short-term instructional objectives,

(C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs,

(D) a statement of the needed transition services for students beginning no later than age 16 (and, when determined appropriate for the individual, beginning at age 14 or younger), including, when appropriate, a statement of the interagency responsibilities or linkages (or both) before the student leaves the school setting,

(E) the projected date for initiation and anticipated duration of such services and

(F) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(a)(20); *see also Rowley*, 458 U.S. at 181–82, 102 S.Ct. 3034.

■ It is true that the Coales did not specifically raise these allegations in their letter requesting a due process hearing. *See* Ex. SD–6. Nor did they mention these alleged procedural violations in their closing arguments at the hearing. Nonetheless, there was enough discussion of these issues at the hearing to put the State and the Panel on notice that the Coales were challenging these aspects of the proposed IEP. *See, e.g.,* Tr. 9/23/97 at 12 (Coales' opening statement, noting failure of IEP to identify assistive technology devices); *id.* at 33–34 (testimony regarding how school measures progress on goals and objectives); Tr. 9/24/97 at 148 (testimony regarding need to identify Straitman's writing intervention on IEP); *id.* at 125–30 (testimony regarding how goals and objectives, present levels of performance, and assistive technology are presented on IEP); *id.* at 150–53 (cross-examination regarding subjective nature of objectives); *see also* Def. Op. Br. Sum. J. at 28 ("Each of the professional educators testified at the Due Process Hearing that the goals and objectives of the [IEP] and the placement proposed by the District would enable Alex to continue to progress and benefit educationally, thus providing him with a [FAPE]."). Moreover, these alleged violations go directly to the IEP itself, the "centerpiece" of the IDEA. *See Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); *Michael C.,* 202 F.3d at 646 & n. 2. As such, they were necessarily a part of the Coales' challenge to the State's proposed IEP.

### 2. The Proposed IEP Did Not Fully Comply with The IDEA's Procedural Requirements

■ The proposed IEP is far from perfect. Indeed, the court is somewhat troubled by the challenge it faced in attempting to identify just what IEP was at issue in this case. *See* Section III.B.2, *supra.* The document purporting to be the proposed IEP was apparently adopted by the State on September 12, 1997, yet it is dated March 27, 1997. Looking at the document, one cannot ascertain which sections were actually in existence on that date. At the time of the due process hearing, it remained in "draft" form.

Goals and objectives are identified for three areas of need—(1) written expression, (2) language arts related skills, and (3) speech and language. The "annual goals" for these areas are, as the Coales allege, wholly generic—(1) "To improve written expression and spelling skills," (2) "To improve language expression," and (3) "Alex will incorporate his expressive language skill into his writing." *See* Ex. SD–3. Since the "present level of performance" for these three areas is stated in terms of standardized tests, it is not clear why the "annual goals" for these three areas could not have been similarly quantified.[21]

The inadequacy of the annual goals is somewhat mitigated by much greater specificity in the "objectives and criterion" section for each of the three areas of need. Presumably, the true "annual goal" is to accomplish each of the identified "objectives" by the end of the year. Although some of the evaluative criteria are somewhat subjective, most are sufficient to measure Alex's progress throughout the year. The State reasonably points out that standardized tests are not always available or appropriate to measure progress on specific objectives.

■ The other alleged violations have no merit. The IEP does include adequate "present levels of educational performance" in the form of standardized scores

21. The State contends that annual progress cannot be predicted with certainty. That is undoubtedly true, but to state a "goal" is not to state a "requirement."

for the three "areas of need" and non-standardized assessments for the more specific objectives. The IEP was not required to document the State's plans to have Straitman help Alex's teachers adapt the concepts from the prior year's writing intervention to the 1997–98 curriculum. Nor was the IEP required to describe how Alex was to use his assistive technology to achieve his goals.[22] Even if such disclosures were required, the failure to state them in the IEP was harmless because these were topics that had been discussed at IEP team meetings at which the Coales were present. *See, e.g.,* Ex. SD-40 (June 11, 1996 IEP meeting discussing assistive technology recommendations); Ex. SD-16 (March 27, 1997 IEP meeting at which Straitman discusses writing intervention, and Arons, the Coales' advocate, asks if there would be new independent evaluator now that Straitman was "working collaboratively with the district.").[23]

### D. Remedy

The Third Circuit has developed its own standard for determining the appropriate remedy in cases such as these. According to the Third Circuit rule:

> [A] school district that knows or should know that a child has an inappropriate IEP or is not receiving more than a *de minimis* educational benefit must correct the situation. If it fails to do so, a disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding time reasonably required for the school district to rectify the problem. We believe that this formula harmonizes the interests of the child, who is entitled to a free appropriate education under [the] IDEA, with those of the school district, to whom special education and compensatory education is quite costly.

*M.C. v. Cent. Reg'l. Sch. Dist.,* 81 F.3d 389, 397 (3d Cir.1996). In this case, however, the court has already found that the substantive requirements of the IDEA are satisfied. Further, the 1997–98 IEP's shortcomings, as described above, did not result in the failure of the State to provide

---

**22.** The 1997 amendments to the IDEA increase the level of detail required in IEPs. *Compare* 20 U.S.C. § 1401(a)(20) (pre-amendment requirements), *with* 20 U.S.C. § 1414(d) (post-amendment requirements). As noted in note 1, *supra,* the 1997 amendments relating to IEPs were not effective until July 1, 1998, and are not applicable to this case. Even after the amendments, however, the IEP is not required to document specific "teaching and related service methodologies or approaches," though such topics are appropriate for discussion during IEP team meetings. *See* Senate Comm. on Labor & Human Resources, Individuals with Disabilities Education Act Amendments of 1997, S.Rep. No. 105-17, Part V (1997).

**23.** The Coales also make a separate argument with respect to the alleged failure of the proposed IEP to refer to the consultations that Straitman was to provide. The Panel opinion specifically ordered the State to "continue its consultation with Nina Straitman so she can

recommend any appropriate additional interventions in light of Alex's classroom setting and curriculum." Panel Op. at 27.

The Coales claim that by ordering relief that was neither requested by them nor specified in the IEP, the Panel exceeded its authority rendering its decision unenforceable. As support, they cite *Slack v. Delaware Dept. of Pub. Instruction,* 826 F.Supp. 115 (D.Del. 1993). But *Slack* merely states that a due process panel should not go beyond the issues and evidence presented by the parties. *See id.* at 122–23. As the Coales concede, there was extensive evidence regarding Straitman's consulting with the State. *See* Pl. Reply Br. Sum. J. at 10 (arguing that "Nina Straitman's involvement *as described throughout the record* " should have been listed as a related service on the IEP). To the extent her continued participation should have been documented on the IEP, the proper remedy would be to order the State to do so.

Alex with a FAPE. *See Erickson v. Albu-querque Pub. Sch.*, 199 F.3d 1116, 1122–23 (10th Cir.1999) (stating that "the award of compensatory education is not an appropriate remedy for a failure to provide an individualized determination when the school district provided the student with a FAPE.") (citing cases). As a result, the court declines to order the State to provide compensatory education.[24]

Procedural flaws in an IEP do not necessarily require it to be discarded. In *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983 (1st Cir.1990), the court stated:

> Before an IEP is set aside, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.

*Id.* at 994 (citations omitted); *see also Doe v. Defendant I*, 898 F.2d 1186 (6th Cir. 1990) (noting that adequate parental involvement is primary concern of IDEA's procedural requirements, not statutorily required "laundry list of items" to be specified in an IEP).

The IEP's flaws neither prevented Alex from receiving a FAPE nor seriously hampered the Coales' opportunity to participate in the development of Alex's 1997–98 IEP. Despite the confusion over when the proposed 1997–98 IEP was revised and adopted, the features of the proposed IEP as adopted on September 12 were not substantially different from the recommendations discussed at the March 27 IEP meeting. Further, the Coales received a copy of a substantially completed draft IEP at a meeting on July 31, 1997, and were invited to attend a meeting to finalize the IEP on September 12, 1997. They chose not to attend. And the Coales' invocation of the IDEA's stay-put provision in August of 1997 may explain why the IEP was still in "draft" form after being "adopted" at the September 12 meeting.

As noted above, the IEP's "generic" annual goals were partially remedied by its much more specific objectives and evaluative criteria. Further, although the court has concluded that the Coales sufficiently exhausted their objections to the IEP's goals and objections, it is noteworthy that these violations were not deemed serious enough to warrant mention in the Coales' closing arguments before the Panel. Nor was there evidence that the Coales objected to the insufficiency of the goals and objectives at the various meetings they attended.

The court does not mean to trivialize the importance of the IDEA's procedural requirements. Nor does it intend to shift the burden of creating a proper IEP from the State to the Coales. The State, however, should be given some opportunity to remedy the minor procedural violations without being forced to provide more than what the IDEA requires. *See D.B. ex rel. R.H. v. Ocean Township Bd. of Educ.*, 985 F.Supp. 457, 537 (D.N.J.1997) (refusing to require state to provide residential placement since "[t]he [school] district ... had no opportunity to consider or to revise its proposed IEP based upon ... [the plaintiff's] objections, except in the highly

---

**24.** The parties have informed the court that Alex was removed from the Brandywine School District in December, 2000 and is currently enrolled in a private school in New York. The Coales have not specifically requested reimbursement for the costs of Alex's private school. The court's conclusion, however, that the State provided Alex with a FAPE and that the IEP was not inappropriate (although there were technical procedural violations) would not allow such a result. To the extent that the Coales seek such relief, therefore, their request is denied.

charged atmosphere of the litigation ... and the equally stressful ... period during which the [IEP was produced].”). Of course, in the preparation of any future IEP, the State is bound by the statutory amendments and the regulations that were inapplicable to the facts of this case.[25]

## IV. CONCLUSION

For the reasons stated above, the court finds that the State did not commit any substantive violations of the IDEA in preparing Alex's 1997–98 IEP. Although the court concludes that Alex's 1997–98 IEP is the product of minor procedural flaws, they do not rise to the level of an IDEA violation. The court will issue an appropriate order in conjunction with this memorandum opinion.

## *ORDER*

For the reasons stated in the court's Memorandum Opinion of the same date, IT IS HEREBY ORDERED that:

1. The Coales' Motion for Summary Judgment (D.I.61) is DENIED.

2. The Defendants' Motion for Summary Judgment (D.I.64) is GRANTED.

3. Summary Judgment BE AND IS HEREBY ENTERED in favor of the Defendants.

25.  *See* note 1 and 22, *supra.*